Robert TURNER and wife, Mary Anna Turner, Appellants,

v.

Jerry L. BENSON and wife, Janice Benson, Appellees.

Supreme Court of Tennessee, at Nashville.

May 29, 1984.

William Kennerly Burger, Burger, Fly & McFarlin, Murfreesboro, for appellants.

Granville S.R. Bouldin, Murfreesboro, for appellees.

## OPINION

FONES, Justice.

We granted plaintiffs' TRAP 11 application to review the proper measure of dam-

ages to be applied to a vendee's breach of a real estate contract.

On July 31, 1980, plaintiffs Robert and Anna Turner entered into a contract to sell their residence to defendants Jerry and Janice Benson for $75,000. This residence had been built and specially modified by plaintiffs so that Mrs. Turner could operate a day-care center out of it. There was a designated area in the house for the day-care operation which had its own entrance and bathing facilities for the children. Defendants knew that plaintiffs operated this day-care center out of their residence when this contract was executed.

Defendants also knew at the time of contracting that plaintiffs were looking to buy another house with the proceeds of the sale of their residence. However, not until approximately one month after the contract in question had been signed did plaintiffs obligate themselves to buy another house. Plaintiffs testified that they were not going to buy another house until they knew that defendants had obtained financing and "that their loan is through." Only after defendants told plaintiffs that their loan had been approved did plaintiffs sign a contract to purchase another residence.

The closing on plaintiffs' residence was to be held on September 2, 1980. Defendant failed to show up and never did close the transaction. Suit was filed on September 19, 1980, for specific performance and damages. However, on December 16, 1981, plaintiffs' residence was sold to a third party for $76,000, and the suit was tried on the damage claim alone.

The trial judge found defendants had wilfully breached their contract with plaintiffs. Defendants have not and do not challenge this finding, but rather argue that damages were improperly assessed. Plaintiffs submitted to the trial court a list enumerating ten separate items of damages they claim to have been both reasonable and foreseeable at the time the contract with defendants was entered. The list is as follows:

| | | |
|---|---|---|
| I. | Loss of day-care center facility; $300 weekly net from September 3, 1980 through August 1981 | $15,600.00 |
| II. | Interest paid on funds borrowed as a direct result of Defendants' breach | $11,059.14 |
| III. | Loss resulting from Plaintiff's forced sale of their personal automobile (vehicle valued at $6,595, sold at wholesale to Jackson Brothers Oldsmobile for $4,950, although $5,300.00 was owed on the vehicle) | $ 1,645.00 |
| IV. | Advertising expenses incurred in unsuccessfully attempting to sell the property at auction | $ 415.45 |
| V. | Charges for two of three moves made necessary by the Defendant's breach | $ 464.56 |
| VI. | Plumbing repairs while the residence was unoccupied | $ 365.10 |
| VII. | Commission difference on resale of the property through Bob Parks Realty | $ 60.00 |
| VIII. | Reissuance of insurance after default | $ 260.88 |
| IX. | Utilities cost while the residence was placed back on the market | $ 140.00 |
| X. | Interest paid to mother on loan. | $ 119.60 |
| | TOTAL COMPENSATORY DAMAGES | $30,129.73 |

The trial judge, without discussion of each item of alleged actual loss, evidently awarded plaintiffs every item of damage requested, except the loss of income from the day-care center, for a total judgment of $14,529.73.

The Court of Appeals agreed that the loss of day-care income was not a proper element of damage, but remanded for a further evidentiary hearing upon the issue of the amount of damages.

First of all, the general rule and proper measure of damages available to a vendor as against a breaching vendee in a real estate transaction is that the vendor is entitled to the difference between the contract price and the fair market value of the property at the time of the breach. 77 Am.Jur.2d *Vendor & Purchaser* § 489 (1975); 92 C.J.S. *Vendor & Purchaser* § 537 (1955); see also Annot., 52 A.L.R. 1511 (1928). In addition, however, the vendor may recover special damages, if any, that arise out of the breach of contract in order to compensate the vendor for any loss or injury actually sustained by reason

of the vendee's breach. These special damages, though, must be within the reasonable contemplation of both parties, at the time the contract was made. *Illinois Central Railroad Co. v. Johnson and Fleming*, 116 Tenn. 624, 94 S.W. 600 (1906); *Machine Company v. Compress Co.*, 105 Tenn. 187, 58 S.W. 270 (1900); *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng.Rep. 145 (1854).

Plaintiffs' residence was ultimately sold to a third party approximately one year after defendants' breach. As previously noted, the resale price exceeded the contract price by $1,000. If, at the time of the breach the actual value of plaintiffs' residence equaled or exceeded the contract price, then under the general rule, plaintiffs would be entitled to only nominal damages.

Plaintiffs did not allege as an element of their damages any loss sustained in their losing the $75,000 contract price with defendants. In the record there is an appraisal form from the Murfressboro Federal Savings and Loan Bank stating that their estimate of the market value of plaintiffs' residence as of August 19, 1980, was $75,000. In addition, considering the resale to have taken place only about one year after the breach, and it being an arms-length transaction, rather than a forced sale at auction, we think it reasonable to infer that the fair market value of plaintiffs' residence at the time of the breach was roughly equivalent to the contract price.

■ However, even if plaintiffs are relegated to nominal damages under the general rule, that does not foreclose their opportunity to recover special damages caused by defendants' breach.

The first item of special damages alleged by plaintiffs is the loss of income from the day-care center operated out of their home. The trial court held these "too speculative," while the Court of Appeals found them not to have been "fairly within the contemplation of the parties at the time they made their contract." We agree that lost income is not proper under these circumstances.

From the record it seems that one of the motivating factors behind the plaintiffs' decision to sell their residence was Mrs. Turners' desire to terminate her day-care business. Mr. Turner, on cross-examination testified as follows:

Q Now, I understood that you testified on direct examination that as soon as you put the house on the market you began to notify the parents of the children that your wife was keeping that you were going out of the day care center business?

A That's right. That was the reason that we put the house up for sale. She wanted to quit work and that was the only way that she could quit work.

Q In other words, you had to get rid of the house for your wife to quit work?

A Yes, sir. That's correct.

■ In light of plaintiffs' admitted intention to discontinue their day-care business, lost profits cannot be recovered. The business was to terminate upon the sale of the residence. No profits were to be made thereafter. Accordingly, damages for lost profits occurring after the time the residence was to be sold cannot be said to have been within the "reasonable contemplation of the parties."

The remaining items of special damage all relate in one way or another, to plaintiffs' purchase of another house. From a review of the record, it is clear that defendants knew that plaintiffs were planning to purchase a new home, and we think it a reasonable inference that defendants knew the new purchase would be made with what plaintiffs received from the sale of their own residence. Mrs. Benson stated on cross examination:

She [Mrs. Turner] said well, that she didn't need that big house with just the three of them, that they only had the one child that was still at home, and that she wanted to quit babysitting and that they were going to try to find a smaller house.

This conversation between Mrs. Turner and Mrs. Benson occurred on their initial

meeting, before the contract had been executed.

The contract provided that the purchase price was to be $75,000; $31,000 cash and balance upon "buyer being able to secure loan at Murfreesboro Federal Savings & Loan in the amount of $44,000." Not until defendants told them that their loan had been approved did plaintiffs enter into a contract to purchase their new residence. The contract price on the new residence was $54,000.

■ Under these circumstances, we think the breach by defendants resulted in the plaintiffs owning two houses until they were able to resell their original residence on December 16, 1981. Therefore, every item of expense incurred by plaintiffs as a direct result of owning two houses was within the contemplation of the parties at the time the contract was executed and is recoverable.

■ The contract at issue was breached when defendants failed to close the transaction on September 2, 1980. There was prepared on that date a settlement statement which reveals that the net cash sum due plaintiffs from defendants was $47,-257.01. Plaintiffs were denied the use of this cash from the date of the breach and were entitled to interest calculated thereon at the legal rate. In order to pay for the new residence that they had obligated themselves to, plaintiffs on September 29, 1980, had to borrow $47,000 from the Murfreesboro Bank and Trust at the interest rate of 14½%. We think it was within the contemplation of the parties that plaintiffs would be forced to obtain a loan at the prevailing rate of interest to offset the loss of defendants' purchase money in order to buy the new residence. Accordingly, we hold plaintiffs entitled to interest on $47,-257.01 to be calculated at the legal rate, from September 2, 1980 to September 29, 1980, and at 14½% from September 29, 1980 until December 16, 1981, the date the property was eventually resold. The figure that results from that calculation is an item of damage which plaintiff is entitled to and it should bear interest at the legal

rate from December 16, 1981 until reduced to judgment in the trial court.

■ Plaintiffs, as their third item of damages, argue that they were "forced" to sell their personal automobile at a loss to pay some money to Murfreesboro Bank & Trust in order to avoid a foreclosure on their property. In our opinion plaintiffs' proof as to this item was too vague and speculative to sustain the damages claimed.

■ Item four consisted of advertising expenses incurred by plaintiffs to sell their residence at auction. The auction was unsuccessful but we think it was a valid attempt to mitigate damages and within the reasonable contemplation of the parties.

■ Mr. Turner testified that in October of 1980 plaintiffs moved out of their old residence to the new one hoping that something with defendants "could be worked out." After a few months time, realizing that nothing was going to be worked out, plaintiffs moved back to their original residence in order to rent the smaller house and to keep up the bigger one. Plaintiffs were able to rent the smaller one for three months at $375 per month, and received $1,125 in total rent. Plaintiffs eventually moved back to the smaller house after contracting with the third parties to sell the original residence. We think the first two moves to have been a normal and foreseeable result of the breach and within the contemplation of the parties.

■ Item six involved plaintiffs' claim for plumbing repairs. While living in the smaller residence, plaintiffs had the utilities and water turned off in the larger house until it would be shown to prospective purchasers, at which time both would be turned back on. Mr. Turner testified that he would drain the pipes of all water so that the water in them would not freeze and burst the pipes. However, unfortunately that is just what happened. We think this was a normal and foreseeable result of the breach and within the contemplation of the parties.

■ Item seven involved plaintiffs' claim for $60, the difference in a realtor's commission on $75,000 if the sale to defendants had been closed, and the commission that was charged on the resale. There was no merit whatever to that claim for several reasons, the most obvious being that it was involved in a net gain to plaintiffs of $940.00.

■ Items eight and nine were for insurance costs and utilities. These expenses were incurred in an effort to mitigate damages caused by defendants' breach.

Had plaintiffs failed to insure the property and a loss resulted as a result thereof, they could easily have been chargeable with failure to carry such insurance. The same is true with respect to the cost of heating the premises. *Frank v. Jansen,* [303 Minn. 86] 226 N.W.2d 739 (Minn.1975); see also *Kemp v. Gannett,* [50 Ill.App.3d 429, 8 Ill.Dec. 726] 365 N.E.2d 1112 (Ill.App.1977).

Accordingly, we think these items were normal and foreseeable and within the parties' contemplation.

■ Finally, item ten was for interest paid to plaintiffs' mother. This was not an expense that can reasonably be said to have been within the contemplation of the parties.

We will now examine the credits claimed by defendants.

■ First defendants claim the $1,000 earnest money paid should be credited against any damage award. We disagree. The contract specifically provided that in case of breach, the earnest money provided by buyers could be retained by the agent and applied to the satisfaction of damages sustained by the agent in the loss of the entire commission, the balance of which the agent could sue for. The record is silent as to what happened to the earnest money. The burden of proof is upon defendant to show that plaintiff seller got the benefit of the earnest money contrary to the express provision of the contract. We are entitled to assume the express provision of the contract was carried out and the agent retained the earnest money to apply against his damages.

■ Next defendants claim as a credit the rental income plaintiffs realized. This is a proper credit. However, as an offset to this credit, plaintiffs are entitled to claim any reasonable expenses incurred while renting out the property. It was the defendants' breach that put the plaintiffs in the "rental business" in an effort to mitigate their damages. Offset expenses include, but are not limited to, property taxes, depreciation on the property if any, or any repair work done in an effort to rent out the property.

■ Finally, the additional $1,000 received by plaintiffs on resale of their residence is claimed as another credit. This should not be credited against defendants' liabilities. The actual resale price and any consequence thereof became immaterial upon resolution of the issue of the difference between the sale price and the fair market value at the time of the breach.

Therefore, the Court of Appeals' decision to affirm as to liability and remand as to damages is affirmed, with damages to be determined in accordance with principles announced herein. Costs of this appeal are assessed one-half to plaintiffs and one-half to defendants.

COOPER, C.J., and BROCK, HARBISON and DROWOTA, JJ., concur.