# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 22, 2012 Session

## PHILLIP A. CORBITT ET AL. v. ROLANDA AMOS

**Appeal from the Chancery Court for Davidson County**
**No. 1081-I      Claudia Bonnyman, Chancellor**

---

**No. M2011-01916-COA-R3-CV - Filed September 27, 2012**

---

The sellers of real estate brought this action against the successful bidder at a real estate auction after the bidder failed to close because she was unable to obtain a loan sufficient to purchase the property. The sellers later auctioned the property for a substantially lower price. It is undisputed that the buyer breached the contract by not closing and that the sellers are entitled to recover certain special damages; the buyer challenges the trial court's award of $55,300 for the seller's general damages for their loss of the benefit of the bargain. We have determined the trial court's decision is not supported by competent evidence in the record and that the sellers failed to prove the fair market value of the property on the date of the breach was less than the contract price. Therefore, we reverse the award of $55,300 for the loss of the benefit of the bargain. We, however, affirm the award of special damages, specifically the expense of conducting a second auction and sale, property taxes paid between the date of the breach and the second sale, and prejudgment interest, which shall be calculated based upon the judgment as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part; Reversed in Part**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT, J., and BEN H. CANTRELL, SP. J., joined.

Douglas Berry, Nashville, Tennessee, for the appellant, Rolanda Amos.

Michael K. Radford, Brentwood, Tennessee, for the appellees, Phillip A. Corbitt and Vera A. Corbitt.

# OPINION

Plaintiffs Phillip A. Corbitt and Vera A. Corbitt lived in their home located at 2113 Cliff Drive, just off Clarksville Pike in the Bordeaux area of Nashville, Tennessee, for over twenty years. They also owned an unimproved parcel immediately adjacent to their home.[1] Together, the two parcels comprise three acres. The area is generally residential with some commercial property located around the Corbitts' property, including a trailer court located between the Corbitts' property and Clarksville Pike.

In 2005, the Corbitts began making plans to relocate and decided to list their property for sale; the listing price for both parcels together was slightly under $250,000. The property remained on the market for several years and was listed with four or five different real estate agents, yet the Corbitts only received one written offer, which ultimately fell through.[2] Finally, in April 2009,[3] the Corbitts decided to attempt to sell their property at auction and engaged the services of Prudential Rowland Auction Division ("Prudential").

The auction was held on June 13, 2009. At the beginning of the auction, prospective bidders were informed, *inter alia*, that the sale was not contingent on financing. There were several serious bidders; in the end, Ms. Rolanda Amos, a real estate agent who also lived on Cliff Drive, made the winning bid of $174,000.

Following the auction, Ms. Amos and the Corbitts signed an "Auction Contract for Sale of Real Estate" and Ms. Amos paid $8,700 (5% of the purchase price) in earnest money to Prudential, which was to be held in escrow until closing. The closing was scheduled to take place within thirty days, on or before July 13, 2009. The contract also provided that in the event of a buyer's default, the earnest money "shall be retained" by the sellers for "partial liquidated damages."

Soon after the auction, Ms. Amos's financing fell through, and she informed the Corbitts that she would be unable to close. Attempts to contact the second highest bidder

---

[1]The Corbitts acquired the parcels in April of 1990 and October of 1993, respectively. They purchased the vacant lot to serve as a buffer between their property and a trailer park that was expanding into a lot directly adjacent to the vacant lot the Corbitts purchased. The parcel with the small house on it was purchased for $44,000; the vacant parcel was purchased for $30,000. Each parcel was approximately one and one-half acres.

[2]The Corbitts did not accept the offer because the buyer was "involved in a real estate scam."

[3]The Corbitts decided to auction the property because they had purchased a home with their daughter and relocated to Smyrna, Tennessee. The Cliff Drive home was left unoccupied and had several break-ins.

were unsuccessful and the third highest bidder was no longer interested in the property. On the advice of Prudential, the Corbitts decided to have a second auction. There was a delay in scheduling the second auction due to Ms. Amos's failure to timely provide a signed release of the earnest money, which the Corbitts needed in advance of the second auction for advertising. Ms. Amos signed a release to the earnest money on September 14, 2009, and the second auction took place October 17, 2009.

The bidding at the second auction was less competitive than the first, and the highest bid was $100,000. The sale was subject to a 10% buyer's premium to cover the auctioneer's fees; therefore, the total purchase price was $110,000. The closing took place on November 2, 2009.

The Corbitts filed this action against Ms. Amos for breach of contract on January 19, 2010. They requested $74,000 in general damages for the difference between Ms. Amos's contract price and the price for which they ultimately sold the property. They also requested special damages for the property taxes and maintenance costs on the property incurred between July 13 and November 2, the costs of the second auction, and prejudgment interest. In her answer, Ms. Amos asserted that the Corbitts had agreed to assist her with securing alternative financing but failed to do so, and that they failed to take the appropriate measures to mitigate their damages.

On October 13, 2010, the Corbitts filed a motion for summary judgment. The trial court partially granted the motion by order dated December 17, 2010, finding that the undisputed facts established Ms. Amos breached the contract by failing to close by July 13, 2009. The trial court found there were disputed facts as to the amount of damages and scheduled an evidentiary hearing for April 14, 2011.

Before the hearing began, the parties agreed and the trial court found that the Corbitts' general damages were to be determined by calculating the difference between the contract price of $174,000 and the fair market value of the property at the time of the breach, July 13, 2009. Mr. and Mrs. Corbitt testified on their own behalf, as did David Gilliam, the Prudential real estate broker/auctioneer who handled both auctions. Ms. Amos also testified.

At the conclusion of the hearing, the trial court made the following findings:

The contract price between the plaintiffs and the defendant was $174,000. The court finds that the market value of the property at the time of the breach was $110,000, which was the purchase price of the property at the second sale. The defendant paid $8,700 earnest money upon contracting that was eventually paid to plaintiffs for which she is entitled to credit. Thus, the damages

attributable to the loss of the plaintiffs' bargain are $55,300 ($174,000 - $110,000 - $8,700).

The trial court further found that the Corbitts were entitled to recover $1,363.48 for property taxes paid between July 13, 2009 and November 2, 2009; $2,323.00 for the costs of the second auction, and prejudgment interest. The trial court denied the Corbitts' request for an award for property maintenance costs. Ms. Amos filed a timely appeal challenging the award to the Corbitts of $55,300 for general damages.

## ANALYSIS

### I.

When a plaintiff alleges breach of contract, he or she is responsible for proving: "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *BancorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 227 (Tenn. Ct. App. 2006). It is undisputed that an enforceable contract existed and that Ms. Amos breached the contract; therefore, the issues on appeal concern whether the trial court erred in awarding $55,300 for general damages.[4]

The trial court found the fair market value of the property at the time of the breach, July 13, 2009, to be $110,000. Ms. Amos contends that the trial court arrived at this value by relying solely on the opinion testimony of the Corbitts and the purchase price at the second auction, neither of which, Ms. Amos asserts, constitutes competent evidence of the fair market value on the date of the breach in this case. As a result, Ms. Amos argues, the Corbitts failed to carry their burden of proof and the trial court's award for general damages must be reversed.

### A.

The purpose of assessing damages in a breach of contract action is to make the non-breaching party whole, to place the non-breaching party "in the same position he [or she] would have been in had the contract been performed." *Hiller v. Hailey*, 915 S.W.2d 800, 805

---

[4]Ms. Amos does not contest the trial court's award to the Corbitts for special damages, which amount includes $1,363.48 for property taxes the Corbitts paid between July 13 and November 2, 2009 and $2,323,00 for the costs of the second auction, plus prejudgment interest. The Corbitts also did not appeal the trial court's decision to deny them payment for the maintenance costs they incurred between July 13 and November 2, 2009. Thus, except where otherwise indicated, any reference to "damages" in the analysis section refers to the general damages award for the Corbitts' loss of the benefit of the bargain.

(Tenn. Ct. App. 1995). That is to say, "[o]nly persons who have actually sustained an injury, or who have suffered an actual loss, may recover damages." *Custom Built Homes v. G.S. Hinsen Co., Inc.*, No. 01A01-9511-CV-00513, 1998 WL 960287, at *3 (Tenn. Ct. App. Feb. 6, 1998).

When a buyer has breached a contract for the purchase/sale of real estate, the proper measure of damages available to the seller is "the difference between the contract price and the fair market value of the property at the time of the breach." *Turner v. Benson*, 672 S.W.2d 752, 754-55 (Tenn. 1984) (citations omitted). The date of the breach is generally held to be the closing date of the transaction. *Hatchell*, 223 S.W.3d at 229. "The fair market value of realty is the price a reasonable buyer would pay if he were willing to buy but did not have to and that a willing seller would accept if he were willing to sell but did not have to." *Nashville Hous. Auth. v. Cohen*, 541 S.W.2d 947, 950 (Tenn. 1976). Thus, to be entitled to damages, the seller must prove that on the closing date, the "price a reasonable buyer would pay . . . and that a willing seller would accept," is less than the contract price. *See Turner v. Benson*, 672 S.W.2d 752, 755 (Tenn. Ct. App. 1984).

A party seeking damages must present sufficient evidence "to enable the trier of fact 'to make a fair and reasonable assessment of damages.'" *BancorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 230 (Tenn. Ct. App. 2006) (quoting *Wilson v. Farmers Chem. Ass'n, Inc.*, 444 S.W.2d 185, 189 (Tenn. Ct. App. 1989)). While the party seeking damages is not required to prove the exact amount of his or her damages, there must be "proof of damages within a reasonable degree of certainty." *Redbud Coop. Corp. v. Clayton*, 700 S.W.2d 551, 561 (Tenn. Ct. App. 1985).

"Determinations concerning the amount of damages are factually driven. Thus, the amount of damages to be awarded in a particular case is essentially a fact question." *Hatchel*, 223 S.W.3d at 229 (quoting *Beaty*, 15 S.W.3d at 827). We review a trial court's findings of fact "de novo upon the record of the trial court, accompanied by a presumption of correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). Because of the presumption of correctness, we defer to the trial court's findings of fact. *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999); *Taylor v. Trans Aero Corp.*, 924 S.W.2d 109, 112 (Tenn. Ct. App. 1995)).

B.

The Corbitts were the only witnesses to render an opinion as to the fair market value of the property as of the date of the breach, July 13, 2009. Thus, the dispositive issue in this

case is whether the Corbitts' opinion testimony is sufficiently certain "to enable the trier of fact to make a fair and reasonable assessment of damages" as a matter of law.[5]

An owner of property is competent to testify as to the value of his or her property. *See* Tenn. R. Evid. 701(b); *see also Sikora v. Vanderploeg*, 212 S.W.3d 277, 283 n.5 (Tenn. Ct. App. 2006). However, an owner's valuation testimony is not competent evidence of value *if* it is based on pure speculation or an erroneous standard." *Airline Const., Inc. v. Barr*, 807 S.W.2d 247, 256 (Tenn. Ct. App. 1990) ("Although an 'owner' of real property is deemed to have special knowledge about his property to offer an opinion as to its value, the owner's opinion will be given little weight when founded upon pure speculation. There must be some evidence, apart from mere ownership, that this 'value' is a product of reasoned analysis."). Mere ownership is not, by itself, sufficient to make the valuation opinion. *Id.*

Ms. Corbitt's testimony regarding the fair market value as follows:

Q. On July 13 you and your husband still owned this property. What was the value of this property in your opinion?

A. In my opinion on the 13th the property was about worth a hundred thousand at that point in time.

Q. Why do you believe that?

A. I believe it dropped from the one fifty that I felt it was worth at the beginning in the first sale to one hundred after it didn't close. The market was still soft and Ms. Amos had not closed, and by not closing that put a bad reputation on our property because everyone is thinking it had sold and it had never. It damaged it. So now it's back in our hands, again not sold, so it makes it look kind of like tarnished property. It's not good for the reputation of the property.

---

[5]Ms. Amos's opinion testimony as to the fair market value of the property was excluded due to the fact that she was no longer licensed as a realtor by the date of the trial. Ms. Amos also entered into evidence the 2009 tax appraisal on the property, which showed a value of $193,000; however the trial court did not consider the tax appraisal when determining the fair market value, stating, "[t]he Court must find that the tax appraisals by the tax appraiser were not for the purposes of setting fair market value, but for a wholly different purpose; that is, for taxation." Ms. Amos asserts both holdings are in error; however, these issues are pretermitted by our holding in this matter and we decline to rule upon them.

Ms. Corbitt also testified that the property had been vandalized since she and Mr. Corbitt moved to Smyrna and that it would cost "several thousand dollars to get it ready to maybe rent or live in . . . ."

We find Ms. Corbitt's opinion is based on "pure speculation." *Barr*, 807 S.W.2d at 256. First, Ms. Amos's failure to close could not have affected the value of the property until after July 13 and so is not relevant to this analysis. Second, there is nothing in the record to support Ms. Corbitt's opinion that the property was worth $150,000 prior to the breach.[6] The record simply reflects that the Corbitts purchased the property in two transactions totaling approximately $74,000 in the early 1990s, that property was listed at $250,000 for several years without selling, and that the Corbitts had the property re-zoned at some point to increase its value but were unable to sell. Finally, even assuming there is proof the property was worth $150,000 on the date of the first auction, there is no explanation or proof as to how Ms. Corbitt calculated the $50,000 decrease in value in order to arrive at the $100,000 figure.[7] *Cf. Barr*, 807 S.W.2d at 256 (Where a property owner was seeking damages from a contractor for the diminution in value of his property due to defective construction, the court held, *inter alia*, that the owner failed to provide a rational basis for his valuation because he "never stated how he arrived at this arbitrary ten percent reduction figure or the correlation between the defects and this numerical ten percent figure."). Thus, Ms. Corbitt's opinion does not constitute competent evidence of the fair market value. *Barr*, 807 S.W.2d at 256.

As for Mr. Corbitt, it is abundantly clear that his opinion is based solely on the highest bid at the second auction. When he was first questioned by his attorney about the value of the property on the date of the breach, July 13, 2009, he replied, "$150,000." What followed was a confusing series of questions and answers, concluding with the following exchange:

Q. And was your - was the value you gave, $150,000, is that your opinion of the value of the property on [the date of the breach]?

A. On the first auction.

Q. I am asking on July 13th, the day Ms. Amos breached the contract."

_____

[6]When Mr. Corbitt was questioned about the $150,000 pre-breach value, he testified that the figure "was just an assumption I made."

[7]In other words, Ms. Corbitt failed to "show her work" in arriving at the $50,000 figure; for example, proof that comparably priced/sized/situated properties lost $20,000 in value due to the real estate market between June 13 and July 13, 2009, and that repairing the damage done to the property during that 30-day period would cost approximately $30,000.

A.  That would have brought it down to like one hundred thousand.

Q.  So is that your opinion, $100,000?

A.  Yes sir.

Exhibit 21, a summary showing his claim for the loss of the "benefit of his bargain" as $65,300.00, was introduced through Mr. Corbitt on direct examination. On cross-examination, Mr. Corbitt was asked the factual basis of his opinion of the value of the property on the date of breach and the benefit of the bargain sum, to which he replied:

> Okay. What that is, that's - We got a hundred thousand at the second sale. So a hundred thousand is knocked off. $74,000.00 was missed out on. We [subtracted] her earnest money that she put in, and that sixty five thousand is what you come up with.

Thus, because Mr. Corbitt's opinion is entirely based on the sale price at the second auction, we must determine whether that price itself is competent evidence of the fair market value.

## C.

When evaluating cases involving a breach of a real estate contract, "the amount a seller is eventually able to obtain for the property *may* constitute evidence of its fair market value at the time of the breach." *Hatchel*, 223 S.W.3d at 231 (emphasis added) (citations omitted). However, "[t]his rule is conditioned upon the second sale being made on the same or equally favorable terms as the initial sale, the price obtained from the resale be the highest price obtainable for the property and the resale be accomplished within a 'reasonable time' after the vendee's breach." *Id.* (citation omitted).

David Gilliam, the Prudential auctioneer/broker who handled both auctions for the Corbitts, testified about the circumstances under which each of the auctions was conducted. Mr. Gilliam has been a licensed real estate broker and in the auction business since 1995 and is the head of Prudential's auction division. The auction contract for the first auction required the Corbitts to pay $2,993.31 for auction expenses and labor, of which $1,000 was required to be paid in advance. The commission on the sale for Prudential was six percent. Mr. Gilliam stated that the vast majority of the auction fee was dedicated to paying advertising costs. He stated that he advertised the first auction in *The Tennessean*, local advertising in Murfreesboro, and on the Internet. He also advertised the first auction through flyers that were distributed to businesses, convenience stores, and which were posted on bulletin boards

anywhere there were large numbers of people. Signs were posted on the property and leading into the property from various directions for ten days before the first auction. He stated the turnout was moderate but there were three primary bidders. The first auction was advertised as a "reserve auction." The bidding at the first auction started out at $50,000. During the bidding, the auctioneer announced the auction was being changed from a reserve auction to an absolute auction.

For the second auction, which took place October 19, 2009, Mr. Gilliam advertised the auction as an absolute auction instead of a reserve auction. In publicizing the second auction, Mr. Gilliam did not advertise on the Internet or in the local Murfreesboro newspaper as he had done to promote the first auction; instead, he chose to advertise in a consortium newspaper that goes out in Green Hills and other "exclusive areas" in Nashville. Mr. Gilliam spent $2,533.31 on advertising the first auction; he only spent $1,799 to advertise the second auction.[8] Although Mr. Gilliam testified that he believed the advertising was "largely the same" for the second auction as for the first auction, he acknowledged there was a smaller crowd in the second auction. Mr. Gilliam also testified that he was "a little concerned that the crowd might not include serious buyers," thus, just before the bidding began on the day of the auction, it was announced that the auction was being changed from an "absolute auction" to a "reserve auction." Mr. Gilliam explained this last minute change stating, "I thought it was in [the Corbitts'] best interest not to expose themselves to an absolute sale." The two opening bids at the second auction were $15,000 and $20,000; the opening bid at the first auction was $50,000.

Once the bidding reached a certain amount, the auctioneer announced that the auction was being changed again, back to an "absolute auction" as advertised. Mr. Gilliam testified that he thought changing the auction back to absolute would "spur more interest" in the middle of the auction. He further explained that he felt this was necessary because:

> When there's been a property that's been auctioned twice, once or more times, sometimes it's stigmatized by the fact that it didn't sell the first time or didn't close, when in fact it would appear to the public that it had sold. We thought that saying that we were going to sell the property absolute would remove that stigma or would prove to the public that while there was a problem, that the seller's intent was the second time to sell the property no matter what.

---

[8]The Corbitts paid the auctioneer a total of $2,933.31 for the first auction of which $400 was for "labor cost" and the balance of $2,533.31 was spent to advertise the first auction. For the second auction, the Corbitts paid the auctioneer a total of $2,324 of which $500 was for "labor cost," $25 for fuel, and the balance of $1,799 was spent to advertise the second auction.

When asked to explain the difference in prices between the first and second auction, Mr. Gilliam stated that, "the market conditions had changed" from the date of the first auction, and that "we had a smaller crowd and probably less interest from a bidders' perspective the second time than we did the first time;" however, Mr. Gilliam did not render an opinion as to the fair market value of the property as of the date of the breach.

Whether the price obtained in a second sale is sufficient to establish the fair market value of a piece of property at the time of the breach in an auction contract was at issue in *BancorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223 (Tenn. Ct. App. 2006). At the conclusion of the trial in that case, the trial court found the buyer, Hatchel, had breached the contract and that the seller, BancorpSouth Bank, was entitled to damages but, noting that the parties presented "scant proof" as to fair market value of the property on the date of the breach, the court reserved ruling on the amount of damages. *Id.* at 226. Four days later, the bank sold the property for $400,000 at a second auction, and immediately moved the trial court to consider the second sale price as additional evidence of the fair market value at the time of the breach. *Id.* at 226-27. In entering its final judgment, the trial court found that the bank failed to establish fair market value at the time of breach and was thus not entitled to general damages. *Id.* at 227. On appeal, the bank insisted it had established the fair market value of the property at the time of the breach through Hatchel's testimony (that he believed the value of the property on the date of the trial was $400,000), and the amount the bank received at the second sale. Thus, the bank insisted, it was entitled to $175,000 in general damages. *Id.*

In the *Hatchel* appeal, we examined the trial court's finding that insufficient proof was presented at trial to prove the fair market value of the property at the time of the breach:

> The Bank argues that this conclusion is in error because the record demonstrates that sufficient evidence was presented at trial to prove that $400,000 represented the fair market value of the property on the date of the breach. In support of this assertion, the Bank points to Hatchel's testimony to the effect that he believed the fair market value of the property to be $400,000. Further, the Bank points to the testimony of an auctioneer called by Hatchel who stated that he too would value the property at $400,000. The record establishes that both Hatchel and the auctioneer have extensive experience in the real estate business. The Bank's vice president testified concerning a valuation previously conducted by the Bank, which valued the property at $600,000. The Bank, however, never introduced the valuation as an exhibit at trial, and the vice president never elaborated on the veracity or timing of the valuation. The Bank acknowledges that this testimony constitutes the extent of proof proffered at trial in regards to the fair market value of the property,

and it urges this Court to reject the testimony of its vice president and adopt that of Hatchel.

"Without proof of damages, there can be no award of damages." *Inman v. Union Planters Nat'l Bank*, 634 S.W.2d 270, 272 (Tenn. Ct. App. 1982). "The party seeking damages has the burden of proving them." *Overstreet v. Shoney's, Inc.,* 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999) (citing Inman, 634 S.W.2d at 272). Courts are not permitted to award damages based on mere conjecture or speculation. *Id.* "However, uncertain and speculative damages are prohibited only when the existence of damages is uncertain not when the amount of the damage is uncertain," *Moore Constr. Co., Inc. v. Clarksville Dep't of Elec*., 707 S.W.2d 1, 15 (Tenn. Ct. App. 1985) (citing *Cummins v. Brodie*, 667 S.W.2d 759, 765 (Tenn. Ct. App. 1983)); *see also Jennings v. Hayes*, 787 S.W.2d 1, 3 (Tenn. Ct. App. 1989), or when the evidence presented by the plaintiff is insufficient to enable the trier of fact "to make a fair and reasonable assessment of damages," *Wilson v. Farmers Chem. Ass'n, Inc*., 60 Tenn. App. 102, 444 S.W.2d 185, 189 (Tenn. Ct. App. 1969).
. . . .

Despite the fact that the Bank had the burden of proving its damages, it presented no proof at trial that would enable the trial court to establish those damages with a reasonable degree of certainty. The Bank readily concedes as much on appeal by arguing that this Court should disregard the testimony of its vice president concerning the Bank's previous valuation of the property. As the Bank admits in its brief, it presented no evidence tending to prove the method used in conducting the valuation, the purpose for the valuation, or the timing of the valuation. Instead, the Bank asks this Court to accept the proof offered by Hatchel to the effect that $400,000 represented the fair market value of the property on the date of the breach. The trial court, however, discounted this testimony because it went to prove the fair market value of the property at the time of trial, not the fair market value at the time of the breach.

*Id*. at 229-30.

In *Hatchel*, we concluded that the trial court properly did not consider Hatchel's valuation testimony, and, concerning the weight of the second sale price in determining fair market value at the time of the breach, we found that "the amount a seller is eventually able to obtain for the property may constitute evidence of its fair market value at the time of the breach," but that: "In order for the price received at a subsequent sale to represent the fair market value of the real property, *the subsequent sale must be conducted under*

*circumstances similar to those present at the initial sale* and in an arms-length fashion." *Id.* at 232 (emphasis added). We then focused on the different circumstances of the two sales. The contract giving rise to the dispute and the contract arising from the second sale both originated from a forced sale of the property at auction, one occurring a few months after the other, and the court went on  find "[t]hus it initially would appear that the two sales are similar." *Id.* However, we went on to identify material differences in the two foreclosure sales:

> At the first sale, however, the Bank clearly was motivated to achieve the highest possible price for the property. Further, the evidence in the record supports the inference that the bid placed by Hatchel at the first sale was somewhat influenced by certain incentives offered by the Bank should he place the highest bid. Thus, while the manner of conducting the sale was the same in both instances, there is a drastic change in the circumstances and motivations of the Bank between the first and second foreclosure sale. After Hatchel breached the parties' contract by refusing to consummate the transaction, the real property at issue was not sold on the open market but in a forced sale at auction. At the second foreclosure sale, the Bank, in essence, stood on both sides of the transaction acting as both buyer and seller. While it was entirely permissible for the Bank to do this, this environment is not conducive to enabling a fact finder to determine the fair market value of the property with a reasonable degree of certainty.
>
> Our appellate courts previously have expressed the view that the price received for real property in a forced sale at auction might not be indicative of its actual fair market value on the date of breach. *See Turner v. Benson*, 672 S.W.2d 752, 755 (Tenn. 1984) ("In addition, considering the resale to have taken place only about one year after the breach, *and it being an arms-length transaction, rather than a forced sale at auction*, we think it reasonable to infer that the fair market value of plaintiffs' residence at the time of the breach was roughly equivalent to the contract price." (emphasis in original)); *Tinkham v. Beasley*, No. M1999-02809-COA-R3-CV, 2000 Tenn. App. LEXIS 776, at *8, 2000 WL 1727780, at *3 (Tenn. Ct. App. Nov. 22, 2000) ("The fact that the house sold for $155,000 in a forced sale at auction some four months later does not undermine the trial court's decision not to value the home at less than $167,000 because . . . one would expect that property sold at auction would bring a lower price.").

*Id.* at 232-33.

Based upon the foregoing analysis, we reached the following conclusion:

Given the circumstances surrounding the post-trial foreclosure sale in this case, we hold that the trial court did not err when it decided to reject the price received by the Bank at the second foreclosure sale as it cannot be determined with a reasonable degree of certainty that this amount represented the fair market value of the property on the date of Hatchel's breach of the parties' contract.

*Id.* at 233.

Another persuasive case involving damages for breach of a contract for real estate is *Tinkham v. Beasley*, No. M1999-02809-COA-R3-CV, 2000 WL 1727780 (Tenn. Ct. App. Nov. 22, 2000). In that case, the trial court held that the contract price and the fair market value at the time of the breach were the same notwithstanding the fact the house was sold a few months later for less than the contract price; therefore, the court awarded only special damages. *Id*. at *2.

The contract price in *Tinkham* was $167,000, the house subsequently sold for $155,000, and the trial court rejected the subsequent sales price finding it insufficient to prove the fair market value as of the date of the breach, which was affirmed on appeal. As we explained in *Tinkham*:

Kathy Tinkham testified that the fair market value of the house was $167,000, although she also stated that the house had been appraised at $171,000. The real estate agent, Mr. Penix, agreed that he felt the fair market value of the property was $167,000. This evidence is not inconsistent with the rule requiring that the fair market value be measured from the date of the breach. *See Turner*, 672 S.W.2d at 754. The fact that the house sold for $155,000 in a forced sale at auction some four months later does not undermine the trial court's decision not to value the home at less than $167,000 because, as Mrs. Tinkham testified, one would expect that property sold at auction would bring a lower price. *See Turner*, 672 S.W.2d at 755 (inferring that the sales price of property sold in a forced sale at auction might not be a reliable measure of the fair market value).

*Id.* at *3.

In the case at bar, the trial court found "nothing amiss about either the first or the second sale" and that the proof established the fair market value at the time of the breach was

$110,000, which was the price the property sold for at the second auction.[9] The evidence does not preponderate against the finding that nothing was amiss about either auction; however, the second auction was not promoted or conducted under circumstances similar to the first auction. *See Hatchel*, 223 S.W.3d at 229-30. As discussed earlier in this opinion, the advertising and promotion for the second auction was different from the first auction and they only spent 72% of what had been spent to promote the first auction to promote the second auction. As a result, fewer bidders were present at the second auction; Mr. Corbitt estimated as few as one-half the people who attended the first auction. The second auction was also conducted in a different manner for the second auction was publicized as an absolute auction, then just before the bidding began it was announced that it was changed from absolute auction to reserve auction, and during the bidding it was changed back to absolute auction. Further, the second auction was different from the first in that a 10% buyer's premium was to be added to the successful bid to pay the auctioneer's commission; in the first auction, the commission was deducted from the successful bid. Furthermore, at the first auction, the successful bidder only paid 5% down and had 30 days to close; at the second auction, the successful bidder had to pay 10% down and only had 15 days to close.

Based upon the above facts and other facts in the record, we have concluded that the second auction was not conducted under circumstances similar to those present at the first auction.

We also find it significant that the property suffered from vandalism and destruction of property after the first auction, some of which occurred before the breach and some after the breach but prior to the second auction, all of which most assuredly diminished the fair market value of the property. For example, at some point, either before or after the date of the breach, someone tore out the back door, homeless people were living there from time to time and vandalized the property, and all of the copper was removed from the heating units to the house. The testimony of the Corbitts concerning when these events occurred, meaning whether they occurred prior to or subsequent to the date of breach, is equivocal at best. Thus it cannot be determined from this record when the damage occurred. Moreover, there is no evidence in the record concerning the amount of the damage to the property. As discussed earlier in this opinion, to be entitled to damages, the seller must prove that the "price a reasonable buyer would pay . . . and that a willing seller would accept," on the day of the breach – the closing date – was less than the contract price. *See Turner*, 672 S.W.2d at 755. Due to the damage to the property, much of which was sustained after the date of the breach, and the fact the Corbitts failed to establish what damage occurred before and what occurred after the date of breach, the price obtained at the second auction months later cannot serve

_____

[9]The highest bid at the second sale was $100,000 and the buyer was also required to pay a $10,000 "buyer's premium."

as a reliable indicator of the fair market value at the time of the breach. As a further consequence, Mr. Corbitt's opinion as to the fair market value is not supported by competent evidence in the record.

D.

We have determined that the Corbitts failed to provide competent, reasonably certain proof as to the fair market value of the Cliffside Drive property on the date of the breach, a value which is essential for determining damages in this case. "Without proof of damages, there can be no award of damages." *Id.* at 229. Accordingly, the award to the Corbitts of $55,300 for their general damages is reversed.

**II.**

The above holding notwithstanding, the Corbitts are entitled to recover their special damages resulting from Ms. Amos's breach of the contract. *See Turner*, 672 S.W.2d at 755 (The non-breaching vendor "may recover special damages that arise out the breach of contract in order to compensate the vendor for any loss or injury actually sustained by reason of the vendee's breach."). Accordingly we affirm the award to the Corbitts of their special damages including $2,323 for the expense of conducting a second auction and sale and $1,363.48 for property taxes paid between the date of the breach and the second sale. Further, as the trial court concluded, the Corbitts are entitled to recover prejudgment interest in accordance with Tennessee Code Annotated § 47-14-123, which shall be calculated based upon the judgment as modified. *See also Otis v. Cambridge Mut. Fire Ins.*, 850, S.W.2d 439, 446 (Tenn. 1992).

**IN CONCLUSION**

The judgment of the trial court is affirmed in part and reversed in apart, and this matter is remanded for the entry of judgment consistent with this opinion. One-half of the costs of appeal are assessed against Ms. Amos and one-half of the costs are assessed against the Corbitts.

_____
FRANK G. CLEMENT, JR., JUDGE

-15-