IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 21, 2021 Session

**RICHARD J. HARTIGAN ET AL. v. ARNOLD BRUSH, INDIVIDUALLY AND IN HIS CAPACITY AS ADMINISTRATOR OF THE ESTATE OF PAMELA SUE BRUSH**

**Appeal from the Chancery Court for Roane County**
**No. 2015-124          Frank V. Williams, III, Chancellor**

_____

**No. E2020-01442-COA-R3-CV[1]**

_____

This is the second appeal in this action for breach of a contract to purchase improved real property. Prior to the first appeal, the trial court, having found following a bench trial that the defendant buyers, Arnold Brush and Pamela Sue Brush, had breached the parties' purchase and sale agreement, initially entered damage awards in favor of the plaintiffs, who included the sellers, Richard J. Hartigan and Leila R. Hartigan; the Hartigans' realtor, James M. Henry d/b/a Coldwell Banker Jim Henry & Associates ("Coldwell Banker"); and a realty company, Lakeway Realty Group, Inc. ("Lakeway Realty"), with whom the Brushes had entered into a buyer representation agreement. Mr. Brush, by then acting individually and as the Administrator of the Estate of Pamela Sue Brush, appealed to this Court, raising issues concerning the trial court's calculations of damages and pre-judgment interest. This Court affirmed the judgment in favor of Lakeway Realty but vacated the award of damages and prejudgment interest to the Hartigans and the calculation of prejudgment interest awarded to Coldwell Banker. This Court directed that upon remand, the trial court was to enter additional findings of fact regarding the fair market value of the property, with further proceedings as necessary, and recalculate the amount of prejudgment interest awarded to Coldwell Banker. Following a hearing on remand, the trial court entered a final order, confirming its previous damages award to the Hartigans and ratifying an announced agreement awarding a revised total judgment to Coldwell Banker in the amount of $18,240.16. As pertinent on appeal, the trial court awarded a judgment to the Hartigans in the total amount of $225,688.98, representing the difference between the purchase price set forth in the purchase agreement and the price ultimately paid for the real property by third parties, minus earnest money paid, plus prejudgment interest and costs for upkeep and a share of attorney's fees and private investigator fees. The trial court also awarded post-judgment interest to the Hartigans pursuant to Tennessee Code Annotated § 47-14-122. Mr. Brush has appealed the general

---

[1] Upon the appellant's motion, this Court entered an order on April 12, 2021, consolidating the record from the prior appeal in this matter, No. E2019-00262-COA-R3-CV, with the record in the instant appeal.

damages and interest awarded to the Hartigans. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and KRISTI M. DAVIS, JJ., joined.

Jerrold L. Becker, Knoxville, Tennessee, for the appellant, Arnold Brush, individually and in his capacity as Administrator of the Estate of Pamela Sue Brush.

Sharon Reynolds Clark, Kingston, Tennessee, for the appellees, Richard J. Hartigan; Leila R. Hartigan; James M. Henry d/b/a Coldwell Banker Jim Henry & Associates; and Lakeway Realty Group, Inc.

**OPINION**

I. Factual and Procedural Background

The improved real property at issue is a five-thousand square foot, custom-built home located on a 1.3-acre lot within a gated community in Kingston, Tennessee ("the Property"). Upon the first appeal of the trial court's judgment following the bench trial, this Court set forth the following pertinent factual and procedural history:

> In 2007, Plaintiffs Richard J. Hartigan and Leila Hartigan (collectively, "Sellers") built a five-thousand square foot custom home on 1.3 acres of real property in the Highland Reserve subdivision in Kingston, Tennessee, at a cost of approximately $951,000. The property sits on a ridge approximately 300 feet above the Tennessee River and has water views from all sides. The Highland Reserve subdivision is a gated community and offers amenities including a swimming pool, a pavilion, and a pond which are available for use by the homeowners.
>
> In August 2014, the Hartigans engaged a realtor for a term of six months to sell the home. The realtor did not show the home during that time. In April 2015, the Hartigans engaged another realtor, Kathy May Martin with James M. Henry d/b/a Coldwell Banker Jim Henry & Associates ("Coldwell Banker"). The Hartigans' listing agreement with Ms. Martin provided for a listing price of $750,000 and a realtor's commission of six percent.

In Spring 2015, Defendants Arnold Brush and wife, Pamela Brush decided to relocate from Arizona to Tennessee. In May 2015, the Brushes entered into an exclusive buyer representation agreement with Carol Ann Buchanan of Lakeway Realty Group, Inc. ("Lakeway Realty"), to act on their behalf. The agreement, which expired on November 16, 2015, provided for Lakeway Realty to be paid a three-percent commission on the sales price of property purchased by the Brushes.

In June 2015, the Brushes made an offer to purchase Sellers' property for $675,000. The Brushes requested a closing date of July 14, 2015, "or any other date of Seller's choice before Labor Day, September 7, 2015." Sellers counter-offered at a sales price of $712,000 and a closing date of July 23, 2015, "or any day prior to Labor Day." The Brushes accepted Sellers' counter-offer on June 16, 2015, and the Brushes deposited earnest money in the amount of $6,000 with Lakeway Realty.

Several appraisals of the property were performed as the Brushes sought financing for the purchase. An appraisal conducted for Quicken Loans valued the property at $640,000. On the advice of Ms. Buchanan, the Brushes decided to seek financing from a local lender, Peoples Home Equity, Inc. ("Peoples Home Equity"). An appraisal performed by the Thomas Fuller Appraisal Company for Peoples Home Equity in July 2015 valued the property at $730,000. The parties set a closing date of August 11, 2015, and a final walk-through was conducted on August 9. Peoples Home Equity determined an additional appraisal was necessary, however, and the parties were unable to close on August 11. An appraisal performed by Appraisal Management Specialists for Peoples Home Equity on August 12, 2015, valued the property at $712,000.

Peoples Home Equity neither approved nor denied the Brushes' financing application, and the Brushes chose to forfeit their earnest money and withdraw from the purchase agreement on August 27, 2015. On September 27, 2015, the Brushes entered into a contract to purchase a home in Gallatin, Tennessee, at a purchase price of $575,000. They closed on the Gallatin property on November 25, 2015.

Sellers relocated to Michigan just prior to the anticipated August 11, 2015 closing date, leaving the property vacant but continuing to maintain it in good condition. Coldwell Banker continued to market the property. The

listing price was reduced to $590,000 and reduced again at some point prior to the property eventually selling for $550,000 in October 2016.

On November 12, 2015, Sellers, Coldwell Banker, and Lakeway Realty (collectively, "Plaintiffs") filed an action for breach of contract against the Brushes in the Chancery Court for Roane County. In their complaint, the Hartigans sought specific performance of the June 2015 purchase agreement, special damages arising from the breach, prejudgment interest, attorney's fees, and costs. They prayed in the alternative for an award of damages for breach of contract, special damages, prejudgment interest, attorney's fees, and costs. Coldwell Banker sought damages in the amount of $25,632 as a third-party beneficiary of the purchase agreement, in addition to prejudgment interest, attorney's fees, and costs. Lakeway Realty sought damages in the amount of $21,360, prejudgment interest, attorney's fees, and costs. In January 2018, Lakeway Realty filed an amended complaint seeking additional damages under the May 2015 exclusive buyer representation agreement. In its amended complaint, Lakeway Realty asserted that it was entitled to a commission of three percent of the purchase price of the property purchased by the Brushes in Gallatin. It sought a judgment in the amount of $17,250 plus prejudgment interest, attorney's fees, and costs.

The Brushes answered the complaint in March 2016, generally denying Plaintiffs' allegations of breach and that Plaintiffs were entitled to a judgment. The Brushes further asserted that they had been unable to secure financing, and that the financing contingency contained in the June 2015 purchase agreement accordingly had not been fulfilled. Pamela Brush died in October 2016, and Defendant Arnold Brush was appointed Administrator of her estate. By agreed order entered March 24, 2017, the matter subsequently proceeded against Arnold Brush ("Mr. Brush") in his individual capacity and as Administrator of the Estate of Pamela Sue Brush.

The trial court heard the matter on October 22, October 26, and December 6, 2018. The trial court determined that Mr. Brush was unable to demonstrate that the Brushes were denied lending, specifically finding that "[t]he fact that the Buyers were unable to secure lending at the rate of interest originally applied for was insufficient to show lending was unavailable." It further found that the Brushes' failure to close on the property constituted a breach of the purchase agreement.

- 4 -

The trial court entered a judgment in favor of Sellers in the amount of $162,000, the difference between the purchase price of $712,000 set-out in the purchase agreement and the 2016 sales price of $550,000. It found that Mr. Brush was entitled to a credit in the amount of $6,000 for the earnest money forfeited under the purchase agreement. The trial court further determined that Sellers were entitled to additional damages in the amount of $28,185.15 for costs incurred from September 7, 2015, until the property was sold in 2016.

The trial court found that Coldwell Banker was entitled to a judgment in the amount [of] $25,632 for amounts due under the purchase agreement, and credited the Brushes with $19,800 against the award for the commission Coldwell Banker received following the sale of the property in 2016. The trial court awarded Lakeway Realty damages in the amount of $21,360 for damages under the purchase agreement and exclusive buyer representation agreement.

The trial court awarded Plaintiffs attorney's fees in the amount of $29,007.30. It found that Plaintiffs were entitled to prejudgment interest in the total amount of $39,203.79. The trial court awarded the Hartigans a judgment in the total amount of $225,688.98. It awarded Coldwell Banker a judgment in the total amount of $20,447.86. Lakeway Realty was awarded a judgment in the total amount of $35,251.40. The trial court entered final judgment in the matter on January 15, 2019, and Mr. Brush filed a timely notice of appeal to this Court.

*Hartigan v. Brush*, No. E2019-00262-COA-R3-CV, 2020 WL 563522, at *1-3 (Tenn. Ct. App. Feb. 4, 2020) (footnote omitted) ("*Hartigan I*").

As he does in the instant appeal, Mr. Brush contended in *Hartigan I* that "the trial court erred by calculating the contract damages in this case as the difference between the June 2015 contractual purchase price of $712,000 and the October 2016 sales price of $550,000," arguing that the trial court should have found the contractual purchase price to be the fair market value. *See Hartigan I*, 2020 WL 563522, at *3 ("The measure of damages to be awarded in an action for breach of contract for the purchase of real property is the difference between the contractual purchase price and the value of the property 'at the time set for closing.'" (quoting *Sec. Land Co. v. Touliatos*, 716 S.W.2d 918, 921 (Tenn. 1986)). Mr. Brush thereby asserted in the first appeal, as he does now, that because "the August 2015 appraised value of $712,000 accurately reflects the market value of the property at the time of breach in August 2015," the Hartigans "are not

entitled to an award of damages or prejudgment interest on those damages." *See Hartigan I*, 2020 WL 563522, at *3 (footnote omitted).

In vacating the trial court's award of damages and prejudgment interest to the Hartigans, this Court determined in relevant part:

> [A]lthough the trial court awarded damages in an amount equal to the difference between the June 2015 contract price and the October 2016 selling price, the trial court's order includes no findings with respect to the fair market value of the property at the time of breach in August 2015. Although the trial court noted the impact of the 2008 financial downturn on the housing market in general, the trial court made no findings with respect to the circumstances surrounding the 2016 sale of the property; with respect to why or when the sales price was reduced; with respect to the appraised value of the property by three appraisers in June, July, and August 2015; or as to whether, in light of the circumstances of this case, the substantially reduced sales price accurately reflected the real market value of the property at the time the Brushes breached the contract in August 2015.

*Id.* at *4. Concerning the damages award to the Hartigans, this Court directed the trial court as follows on remand:

> We . . . remand this matter to the trial court for further findings on this issue and, if necessary, a recalculation of damages. The trial court may conduct further proceedings on this issue, if necessary. Because the amount of prejudgment interest is dependent on the damage award, the issue of the trial court's award of prejudgment interest to the Hartigans is pretermitted, and therefore vacated and remanded.

*Id.* at *5.

On remand, the trial court conducted a hearing on June 16, 2020, during which counsel presented arguments as to the basis of the damages award to the Hartigans and announced an agreement concerning the calculation of prejudgment interest to be awarded to Coldwell Banker.[2] At the beginning of the hearing, Mr. Brush's counsel submitted proposed findings of fact and conclusions of law with citations to the record. The Hartigans' counsel responded to portions of the specific findings and conclusions submitted by Mr. Brush, citing to the transcript and reading from short passages of the transcript. Mr. Brush's counsel responded, also citing to the transcript and reading from

---

[2] The award of prejudgment interest to Coldwell Banker is not at issue in the instant appeal.

it to some degree.  Regarding its calculation of the damages awarded to the Hartigans, the trial court announced its ruling at the close of the hearing, stating in pertinent part:

> Let me begin by saying that first of all we're, when we talk about these appraisals, we're talking about expert opinions.  And the Court is not bound to accept the opinion of any expert, but it should consider expert opinions in light of all of the other evidence in the case, and it can accept or reject any expert opinion that the Court does not feel to be reliable under the totality of the facts.  And so I am not bound to accept any of these appraisals as the fair cash market value of this home but should consider them only insofar as they might add weight or value to other evidence in the trial of the case.

> Here we have an arm's length transaction, a second sale – and let me say, this is – I'm sort of going off on a tangent here, but at the first trial of this case I was personally concerned about the amount of damages that I had awarded against Mr. Brush.  And so on my own initiative I scheduled a rehearing, reargument, on the issue of damages just because I wanted to make sure that the figures that I was working with were the figures that I should be using and that I should not be doing anything to Mr. Brush, or for the plaintiffs, for that matter.  It's not for anybody.  It's trying to determine what's right.

> And I wasn't comfortable because – just because of the sheer amount of money involved.  And so I had another hearing, another argument, and at the conclusion of that I thought that the figure that I had awarded at the first hearing was correct and that the subsequent sale for, I believe it's $550,000 or in that neighborhood, is in this case the best evidence of the fair cash market value of this house when it was later sold, a year – approximately one year later to other buyers after Mr. and Mrs. Brush backed out of the sale, the initial sale.

> And in that regard I would find that the subsequent sale some year or so later was on the same or similar terms and conditions as those that existed at the first sale except to the extent that the actions of Mr. Brush changed those circumstances by his breach – his initial breach of the contract.

> I find that the second sale was an arm's length transaction between willing buyers and willing sellers, neither under the compulsion to buy or sell, and that the plaintiffs had nothing to do with any changes in

circumstances that may have occurred but that the circumstances, to the extent that they did change, were the result of the breach by the defendants Brush.

I could find – first of all, the testimony was that the offer made by Mr. and Mrs. Brush, the $712,000 offer that was accepted, was the first offer that the sellers had, and this was on a house that cost between $900,000 and $1 million to build. And so – and my recollection of the photographs, this is an incredible house. I think I made some comments or findings about that at the conclusion of the trial. This is just an incredible house. It is a spectacular house. It looks like a million dollar house. And I don't have the photographs here in front of me, but my recollection at this point is that this house is up on a high point, and if I'm not mistaken it offers what could be called a bird's-eye view of Roane County, or a large part of it. And I'm just trying to recall what I heard and saw at the first trial of the case. As I say, I haven't opened up the folders over here and gone back through the exhibits, but it just is not only an incredible house, but the location is spectacular.

And this house was built at a – you could say that the timing was terrible, because not only was it a house in terms of its size and cost – I believe that one witness testified that there was no broad market for homes of that size and quality in this area. And that would be my finding: that the house was going to sell for less than what it cost to build it from the day it was built. I can't see from the day it was built how, given the conditions here in this area, that the original builders could have possibly hoped to recover what they had put into the house.

And so they ended up being able to get a contract with Mr. and Mrs. Brush, and the first offer they had for $712,000, but there were many, many things going on back at that period of time. There was the real estate bubble, as I recall, that affected it in 2008 and 2009, and then in the following years it took a long time for the real estate market to recover, and so that was working against the house and the sellers of the house. And while there may have been some recovery for the sale of houses in general, there was testimony that there was no recovery for houses in excess of $500,000. In other words, houses this big, this valuable, this nice, given their construction and location. And so these things clearly affected the fair cash market value of the house. And the fact that the defendants made an offer, had a contract, breached the contract, apparently that is a negative impact as well.

The size and location of the house made it difficult even to find comparables in value for the purpose of making an appraisal. It would have – it just would have seemed extremely difficult to find comparable sales of comparable homes anywhere nearby, and I think that was in the testimony as well.

A lot has been said about the staging of the house for the second sale, that at the second sale the house was unfurnished – essentially unfurnished. There might have been some few items in there but not furnished to the extent that it was at the first sale. But on the other hand, all of that furniture, the furnishings, appliances – whatever had been in the house that the sellers removed – were removed because they had a contract with the defendant Brush and they had to vacate the premises. They had to get their things out. And now the defendants are arguing that for the second sale they should have refurnished it, perhaps not only by bringing back their own furniture from wherever they had it shipped to, which I think was out of state somewhere – I believe they went to another state even – to either bring it back or to perhaps go out and rent enough furniture.

This house, if I'm not mistaken, was something like 5,000 square feet. So they would have had to rent furniture, 5,000 square feet of furniture, which that furniture was there when they had the contract, the initial contract at $712,000, but it wasn't there at the time of the second contract for $550,000 because of their breach. It was their breach that caused the removal of the furniture. And if there was any impact on the second sale it was because of that breach, and so the Brushes should not now be heard to complain because the house brought less at the second sale because it was unfurnished, when they were the ones that caused it to be unfurnished, and that then breached the contract after the furniture and furnishings had been removed from the house.

Otherwise, the circumstances are more than similar to the – at the second sale were more than similar to the first sale. It wasn't sold at auction. It was sold at a private sale. And as I heard the testimony and recall the testimony, it was the first offer that they received after the defendants breached their contract. And that offer was for $550,000 which, given all of the problems in the economy, that bursting housing bubble, the 2008 TVA [Tennessee Valley Authority] ash spill which was mentioned as one factor, and the fact that the sellers removed their things in anticipation of closing, which didn't take place, everything else was similar – the terms

and conditions – everything was similar, and to the extent that it wasn't similar it was because of the actions of the defendants that changed the conditions.

That second sale, from everything that I have heard, for $550,000 was an arm's length transaction on substantially similar terms between willing buyers and willing sellers, neither under the compulsion to buy or sell. And, as a matter of fact, I think [the Hartigans' counsel] read some testimony that the contract that was signed at the second sale was identical – was a form contract, was identical to the contract that was signed and used as the contract between the sellers and the defendants Brush for seven hundred and – the only thing that was different was the amount of money. It was marketed in a substantially similar manner.

So I have no reason – I would say this in deference to the arguments being made on behalf of the defendants: that it could be that the house could have been sold for more than $550,000. It may be – may have been possible to sell it for more than $550,000, but the question is always, Well, when would that have been? How long would the sellers have had to continue to market the property? to advertise it? to show it? when all of these other circumstances were as they were back then, especially for a house that size. As I said, you know, just finding somebody to buy a house that size and that quality in this area would have been tough from the get-go. So to say that it could have been sold for more money you would have to agree that, well, it could have been. We'll never know. We'll never know because the breach of the first contract created subsequent events that led to a subsequent sale at $550,000, and there's no reason that I have heard to find that that was in any way contrived by the sellers or by the brokers or manipulated or was due to any act or omission on the part of the owners or their agents that were calculated to bring a substantially lower price than the $712,000 that the Brushes had agreed to buy it for originally.

So I think that the fair cash market value is exactly what I found. I obviously wasn't thinking of having to make a statement to that effect, but that's the way I saw it then and it's the way see it now. I know it's hard, and that's why I had the second hearing is because I don't like doing things that I know are hard. And so I had the lawyers come back and reargue their case on the issue of damages.

Although the trial court requested that the Hartigans' counsel prepare a final order, upon Mr. Brush's counsel's request, the court allowed Mr. Brush's counsel to submit his

proposed findings of fact and conclusions of law as an exhibit to the remand hearing. It is undisputed that when the Hartigans' counsel prepared a proposed order, Mr. Brush's counsel expressed disagreement with the order. It is also undisputed that the Hartigans' counsel subsequently submitted to the trial court both their proposed order and a copy of findings of fact and conclusions of law that had been prepared by Mr. Brush's counsel.[3] Without further hearing, the trial court entered its final order on October 9, 2020, adopting the proposed order submitted by the Hartigans without making any changes.

The trial court concluded the final order as follows in relevant part:

It is further

> ORDERED, ADJUDGED AND DECREED that based upon the facts presented to this Court the appropriate measure of damages in this case is "the difference between the contract price and the fair market value at the time of the breach." It is further
>
> ORDERED, ADJUDGED AND DECREED that the three appraisals in the record, performed as a part of the Defendants Brush loan, were not credible and could not be relied upon by this Court to determine the fair market value of the property as of the date of the Defendants Brush breach. It is further
>
> ORDERED, ADJUDGED AND DECREED that, by a preponderance of the evidence, the Plaintiffs, Hartigans, are entitled to and are hereby awarded a Judgment against the Defendants Brush, jointly and severally, in the amount of $225,688.98 which was computed by taking the difference between the Purchase Price as set out in the Purchase Agreement, in the amount of $712,000.00, and the price the Plaintiffs were ultimately able to sell the Property to [third parties] in 2016 in the amount of $550,000.00, also being the fair market value of the Property as of the date of the Defendants Brush breach, less a credit to the Defendants Brush

---

[3] On appeal, Mr. Brush attaches, as part of a "collective exhibit" to his brief, a letter purportedly sent by the Hartigans' counsel to the trial court clerk and master, copied to Mr. Brush's counsel, with the Hartigans' proposed order attached, as well as a letter purportedly sent by Mr. Brush's counsel to the Hartigans' counsel with an alternative set of proposed findings of fact and conclusions of law. However, these letters and their attachments are not included in the appellate record. Inasmuch as this Court reviews the record on appeal as it is filed by the trial court, we are unable to consider the content of the documents attached to Mr. Brush's brief. *See* Tenn. R. App. P. 13(c); *Jennings v. Sewell-Allen Piggly Wiggly*, 173 S.W.3d 710, 712 (Tenn. 2005) ("This attachment [to an appellate brief] does not serve to supplement the record on appeal.").

in the amount of $6,000.00 for the Earnest Money forfeited to the Sellers per the terms of the Purchase Agreement, plus costs incurred by the Plaintiffs for the upkeep of the property in the amount of $28,185.15; plus the Plaintiff Hartigans' share of attorney's fees incurred in this cause in the amount of $9,669.10; plus their share of the cost of the private investigator in the amount of $600.00; and plus prejudgment interest in the total amount of $31,234.73. It is further

ORDERED, ADJUDGED AND DECREED that the Plaintiffs shall each be entitled to post-judgment interest in accordance with Tennessee law.

Mr. Brush timely appealed.

## II. Issues Presented

Mr. Brush presents five issues on appeal, which we have restated slightly as follows:

1. Whether the trial court erred by adopting verbatim a final order proposed by the Hartigans that contained findings of fact and conclusions of law devoid of citations to the record.

2. Whether the trial court erred by not affording credibility to the appraisals of the Property when calculating the fair market value of the Property on the date of the contract breach.

3. Whether the trial court erred in its calculation of damages awarded to the Hartigans for breach of contract.

4. Whether the trial court erred by awarding prejudgment interest to the Hartigans.

5. Whether the trial court erred by awarding post-judgment interest to the Hartigans.

## III. Standard of Review

We review a non-jury case *de novo* upon the record with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn.

2000). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006). Although "[d]eterminations concerning the amount of damages are factually driven," "the choice of the proper measure of damages is a question of law." *BancorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 228 (Tenn. Ct. App. 2006) (quoting *Beaty v. McGraw*, 15. S.W.3d 819, 827 (Tenn. Ct. App. 1998)). We review questions of law *de novo* with no presumption of correctness. *See Bowden*, 27 S.W.3d at 916 (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998)); *see also Hatchel*, 223 S.W.3d at 228. The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

This Court reviews a trial court's decision to award prejudgment interest according to an abuse of discretion standard. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). As our Supreme Court has explained:

> An award of prejudgment interest is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion. *Spencer v. A-1 Crane Service, Inc.*, 880 S.W.2d 938, 944 (Tenn. 1994); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 446 (Tenn. 1992). This standard of review clearly vests the trial court with considerable deference in the prejudgment interest decision. Generally stated, the abuse of discretion standard does not authorize an appellate court to merely substitute its judgment for that of the trial court. Thus, in cases where the evidence supports the trial court's decision, no abuse of discretion is found.

*Id.*

## IV. Independent Judgment of the Trial Court

Mr. Brush contends that the trial court erred on remand by adopting verbatim a final order prepared by the Hartigans' counsel. He particularly argues that (1) the order included findings of fact and conclusions of law not specifically made by the trial court during the remand hearing, (2) the findings of fact and conclusions of law did not include specific citations to the trial record, and (3) the record casts doubt concerning whether the final order represents the trial court's own deliberations and decisions. The Hartigans assert that the trial court's final order represents the court's "independent findings" announced orally at the close of the remand hearing with some incorporation of findings

of fact and conclusions of law made in the court's order entered prior to the first appeal. Upon careful review, we determine that nothing in the record before us creates doubt as to whether the trial court's findings of fact and conclusions of law in the final order represent the court's own deliberations and decision.

Our Supreme Court has set forth the standard for a trial court's practice of receiving and utilizing party-prepared findings of fact and conclusions of law as follows in pertinent part:

> In the almost thirty years since *Anderson* [*v. City of Bessemer City, N.C.*, 470 U.S. 564 (1985),] was decided, most courts have approved, but not recommended, the practice of trial courts receiving and using party-prepared findings of fact, conclusions of law, and orders as long as two conditions are satisfied. First, the findings and conclusions must accurately reflect the decision of the trial court. Second, the record must not create doubt that the decision represents the trial court's own deliberations and decision.

*Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 315-16 (Tenn. 2014) (emphasis added). In vacating the trial court's order granting summary judgment in *Smith*, the High Court stated:

> In this case, the judicial act should have consisted not only of announcing a decision to grant part of [the appellant's] motions for summary judgment but also stating the grounds for that decision. Because the record demonstrates that the trial court did not provide the basis for its decision prior to the preparation of the draft orders, the grounds stated in the order cannot be attributed to the trial court.

*Smith*, 439 S.W.3d at 317. This Court has recently noted that "[a]lthough *Smith* involved summary judgment, this Court has previously applied the reasoning in *Smith* to proceedings not involving summary judgment." *Cunningham v. Eastman Credit Union*, No. E2019-00987-COA-R3-CV, 2020 WL 2764412, at *4 (Tenn. Ct. App. May 27, 2020) (citing as examples *Deberry v. Cumberland Elec. Membership Corp.*, No. M2017-02399-COA-R3-CV, 2018 WL 4961527, at *2 (Tenn. Ct. App. Oct. 15, 2018); *In re Dakota M.*, No. E2017-01855-COA-R3-PT, 2018 WL 3022682, at *6 (Tenn. Ct. App. June 18, 2018); *In re Colton B.*, No. M2017-00997-COA-R3-PT, 2017 WL 6550620, at *5 (Tenn. Ct. App. Dec. 22, 2007)).

In this case on remand, given that the parties announced an agreement as to the recalculation of prejudgment interest awarded to Coldwell Banker, the trial court was

tasked with entering further findings of fact regarding the fair market value of the Property, along with attendant reconsideration of damages, including the pre- and post-judgment interest to be awarded, if any, to the Hartigans. At the beginning of the hearing, Mr. Brush's counsel submitted proposed findings of fact and conclusions of law with citations to the trial record. During an opening statement, the Hartigans' counsel responded to specific findings and conclusions submitted by Mr. Brush, citing to and reading passages from the trial transcript. Mr. Brush's counsel countered, also citing to the transcript but not reading from it. Apparently responding to a prior discussion regarding review of the trial transcript, the trial court declined to read the entire transcript in chambers but did afford an opportunity for both the Hartigans' counsel and Mr. Brush's counsel to read any additional portions orally from the trial transcript. At that time, first the Hartigans' counsel and then Mr. Brush's counsel read additional transcript passages to the trial court relative to their respective arguments.

Upon the close of the remand hearing, the trial court announced its ruling, confirming and explaining further its prior adjudication that the Hartigans were entitled to the difference between the $712,000.00 purchase price in the original contract and the $550,000.00 purchase price for which the property ultimately sold. In so ruling, the court clarified its finding that the subsequent sale price represented the fair market value of the real property at the time of the breach in that the subsequent sale had been conducted under substantially similar conditions as those leading to the parties' original purchase and sale agreement.

Following the trial court's oral ruling, Mr. Brush's counsel asked if his findings of fact and conclusions of law should be filed, and the court stated that it would permit those as an exhibit filed relative to the remand hearing. The court then accepted the Hartigans' counsel's statement that she would prepare a draft of the final order. The parties were subsequently unable to agree on a proposed order, and the Hartigans' counsel submitted to the trial court both the proposed order she had drafted and a copy of findings of fact and conclusions of law prepared by Mr. Brush's counsel. The court adopted the proposed order submitted by the Hartigans' counsel without making any changes to it. We will address each of Mr. Brush's arguments concerning the trial court's adoption of the proposed order in turn.

First, Mr. Brush is correct in noting that some findings of fact and conclusions of law appearing in the final order were not specifically made by the trial court during its oral ruling at the close of the remand hearing. A comparison of the trial court's oral ruling to the final order reveals that the findings of fact announced during the oral ruling as to the rationale for calculating the fair market value of the Property and thus for calculating damages are included in the final order. The final order also sets forth the

agreement, announced during the remand hearing, concerning calculation of the award of prejudgment interest to Coldwell Banker.

However, additional findings of fact concerning the breach of the purchase and sale agreement are included in the final order that were not part of the trial court's oral ruling on remand, and the order restates the award of damages to Lakeway Realty that were not at issue in *Hartigan I* and are not at issue here. Comparing these findings to the initial January 2019 "Final Order" appealed in *Hartigan I*, it is apparent that these additional findings were in the original order entered by the trial court prior to the first appeal. We determine that nothing in the final order now appealed from adds to or contradicts the findings of fact and conclusions of law as set forth in the court's combined rulings in its January 2019 written order and June 2020 oral ruling on remand.

Second, Mr. Brush takes issue with a lack of citations to the record in the trial court's final order. However, Mr. Brush offers no authority, and our research has revealed none, requiring that a trial court include citations to the trial record in its final order. Instead, Mr. Brush quotes a passage from the transcript of the remand hearing indicating that the court expressed an unwillingness to read the entire transcript of the three-day trial, over which the court had presided, and instead requested that the parties read any sections they respectively wished to highlight during the hearing. The trial court stated in pertinent part:

> I think during our discussion about setting this case for today there was some mention perhaps of me going back and reading the transcript. And my response to that was that I am absolutely not going to sit around and read the transcript from the previous trial. If there's some testimony from the prior trial that you want me to consider, then you're going to have to read it to me verbatim. I'm not going to read it. I'm willing to listen to it, but I'm not going to read it.
>
> And what you were reading there a minute ago, if you've got some testimony you want me to read and consider . . . . We tried this . . . three days. And I'm not going to sit here and read the transcript from a three-day trial. If there's sufficient evidence in the record for me to make a finding, then I'm willing to do it, but you're going to – and if you want to point me to a particular part of the transcript testimony, I'm willing to listen to it and consider it, but I'm not going to – I'm not going to take the stuff and go back to my office and sit around and spend days thumbing through that. We're going to do it today here now.

The transcript of the remand hearing further indicates that although the Hartigans' counsel began the process of reading sections of the trial testimony to the court, Mr. Brush's counsel also cited the transcript and read from it in some detail during the hearing.

At the conclusion of the trial court's oral ruling, the following exchange occurred:

Trial Court: Do you want any additional findings of fact or conclusions of law at this point? Is there anything that I haven't said, or findings?

The Hartigans' Counsel: I think that covered it.

Trial Court: Mr. Becker [Mr. Brush's Counsel]?

Mr. Brush's Counsel: I'm all right. Your Honor, should I file this proposed findings with the court for the court file?

Trial Court: What is it?

Mr. Brush's Counsel: It's the same thing I gave to you.

Trial Court: Yes. I'll allow you to enter that as an exhibit. That will be Exhibit No. 2.

Mr. Brush's Counsel: Thank you, Your Honor.

Trial Court: And then if it goes up again the appellate courts can take a look at it, but [the Hartigans' counsel] went to a lot of trouble to read the testimony. I remember the testimony. As she read it, I was hearing it again. I heard it once. And I found that that testimony represented my recollection of what I thought at the time to be the facts, and I see no sense in going back any further.

I think that this is a tough case because it was a great big house, a beautiful house, spectacular house, that cost somebody – cost

- 17 -

the sellers well in excess of $900,000 is my recollection. And, again, I just – I haven't gone back and looked at the exhibits, but I may be wrong about this, but I think that house had a view that was a million dollar view, I mean. The house was worth a million dollars, but that view, if I'm not mistaken, was a million dollar view. Just that alone was – you can't find places like that except rarely, but they found one. And so . . . Okay. Ms. Clark [the Hartigans' Counsel].

The Hartigans' Counsel:     I'll prepare the order.

Trial Court:                        Okay.

Mr. Brush intimates that the trial court's refusal to read the entire transcript of a trial over which it had presided means that the court based its findings of fact and conclusions of law solely on the limited portions of the trial testimony read aloud during the remand hearing. We disagree. Likewise, we do not find any abuse of discretion in the trial court's omission of citations to the trial record in its final order. The court's statements at the close of the remand hearing demonstrate that the court was thoroughly familiar with the case, remembered the trial well, and was comfortable that its recollection had been sufficiently rekindled by the hearing to rule and to provide the explanation of its findings that this Court had found lacking in the January 2019 order.

Finally, Mr. Brush asserts that the record contains "ample evidence" "cast[ing] doubt as to whether the decision actually represents the Trial Court's own deliberations and decision." In support of this assertion, Mr. Brush cites the remand transcript, particularly the court's declination to read the entire trial transcript, and then begins his argument as to the remaining issues on appeal. We will address these remaining issues in the subsequent sections of this Opinion. Here, we determine that Mr. Brush is essentially arguing that because the trial court did not find and conclude as he argues the trial court should have, the record casts doubt as to whether the final order represents the court's independent judgment. This argument is without merit.

In addition to *Smith*, Mr. Brush cites *Cunningham*, in which this Court determined that the final order, which had been entered following a bench trial in a probate action, should be vacated, stating in relevant part:

[T]he transcript of evidence approved by the trial court reflects that the court made no oral rulings at the conclusion of the February 12, 2019 trial but instead took the matter under advisement, directing each party to submit proposed findings of fact and conclusions of law. The record is devoid of any direction provided to the parties by the trial court as to drafting their proposed findings of fact and conclusions of law. In its May 7, 2019 order, the trial court subsequently adopted nearly verbatim Executor's proposed findings of fact and conclusions of law.

\* \* \*

Based upon the record before us, we cannot determine that Executor's proposed findings of fact and conclusions of law, adopted nearly verbatim by the trial court, represent the trial court's own independent analysis and judgment.

*Cunningham*, 2020 WL 2764412, at \*4-5.

In contrast to the trial courts in both *Smith* and *Cunningham*, the trial court in the instant action announced its oral ruling in detail, confirming its prior determinations and providing specific findings of fact regarding the fair market value of the Property and the amount of damages to be awarded. We note that in appealing the January 2019 order in *Hartigan I*, Mr. Brush did not raise an issue concerning the trial court's independent judgment.[4] Therefore, Mr. Brush may not now legitimately question the independence of the trial court's earlier findings of fact and conclusions of law from the January 2019 order that have been included in the final order on remand. We conclude that the conditions set forth in *Smith* for the trial court to adopt party-prepared findings of fact and conclusions of law have been met. The findings and conclusions "accurately reflect the decision of the trial court," as evinced by the court's January 2019 order and oral

---

[4] The Hartigans argue in part that if Mr. Brush had believed that the final order cast doubt as to the independence of the trial court's judgment, he should have filed a Tennessee Rule of Civil Procedure 52 motion for additional findings of fact prior to raising the issue on appeal. We note that this Court has repeatedly rejected what is essentially a waiver argument as to this issue. *See Long v. Long*, No. E2020-01350-COA-R3-CV, 2021 WL 4398056, at \*9 (Tenn. Ct. App. Sept. 27, 2021) (declining to deem the issue of the judgment's independence waived because the appellant had not filed a Rule 52 or Tennessee Rule of Civil Procedure 59 motion); *Vaughn v. DMC-Memphis, LLC*, No. W2019-00886-COA-R3-CV, 2021 WL 274761, at \*6 (Tenn. Ct. App. Jan. 27, 2021) ("[W]e have often considered this issue in the absence of the argument being raised in the trial court." (citing as examples *Regions Commercial Equip. Fin., LLC v. Richards Aviation Inc.*, No. W2018-00033-COA-R3-CV, 2019 WL 1949633, at \*8 (Tenn. Ct. App. Apr. 30, 2019); *Bertuccelli v. Haehner*, No. E2017-02068-COA-R3-CV, 2018 WL 6199229, at \*3 (Tenn. Ct. App. Nov. 28, 2018); *Koczera v. Steele*, No. E2015-02508-COA-R3-CV, 2017 WL 1534962, at \*7 (Tenn. Ct. App. Apr. 28, 2017))).

ruling on remand, and the record does "not create doubt that the decision represents the trial court's own deliberations and decision." *See Smith*, 439 S.W.3d at 316.

## V. Fair Market Value and Calculation of Damages

Mr. Brush does not contest that he and his wife breached the purchase and sale agreement. Instead, he contends that the trial court erred in its calculation of the resultant damages to the Hartigans because if the trial court had credited the appraisal that was completed closest to the date of the Brushes' breach, valuing the property at $712,000.00, the damages owed to the Hartigans would have been zero and the Brushes would have been entitled to a credit for the $6,000.00 in earnest money. Mr. Brush's substantive issues on appeal all spring from his contention that the trial court erred in finding that the fair market value of the Property at the time of the breach was equal to the amount for which it subsequently sold, $550,000.00.

The Hartigans assert that the trial court properly determined that the most accurate measure of the fair market value under the facts of this case was the subsequent sale price. Upon thorough review of the record and applicable authorities, we determine that the evidence does not preponderate against the trial court's finding that the fair market value of the Property at the time of the breach was $550,000.00, resulting in a general damages award to the Hartigans in the amount of $162,000.00, representing the difference between the contract price and the fair market value.

"The purpose of assessing damages in a breach of contract action is to make the non-breaching party whole, to place the non-breaching party 'in the same position he [or she] would have been in had the contract been performed.'" *Corbitt v. Amos*, No. M2011-01916-COA-R3-CV, 2012 WL 4473963, at *3 (Tenn. Ct. App. Sept. 27, 2012) (quoting *Hiller v. Hailey,* 915 S.W.2d 800, 805 (Tenn. Ct. App. 1995)). Regarding the measure of damages to be awarded in an action such as the one at bar, this Court explained in *Hartigan I*:

> The measure of damages to be awarded in an action for breach of contract for the purchase of real property is the difference between the contractual purchase price and the value of the property "at the time set for closing." *Sec. Land Co. v. Touliatos*, 716 S.W.2d 918, 921 (Tenn. 1986), *opinion modified on reh'g,* 721 S.W.2d 250 (Tenn. 1986). "'The fair market value of the land is the price that a reasonable buyer would give if he were willing to, but did not have to, purchase and that a willing seller would take if he were willing to, but did not have to, sell.'" *BancorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 229 (Tenn. Ct. App. 2006) (quoting *Nashville Hous. Auth. v. Cohen,* 541 S.W.2d 947, 950 (Tenn. 1976)). We

have noted, however, that the term "fair market value" has not been well-defined by the appellate courts. *Eastman Credit Union v. Bennett*, No. E2015-01339-COA-R3-CV, 2016 WL 1276275, at *5 (Tenn. Ct. App. Mar. 31, 2016). We have cited with approval the definition of fair market value as: "'The price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect.'" *Id.* (citing *Cutshaw v. Hensley,* No. E2014-01561-COA-R3-CV, 2015 WL 4557490 at *5 (Tenn. Ct. App. July 29, 2015)).

"'The party seeking damages has the burden of proving them.'" *Hatchel*, 223 S.W.3d at 229 (quoting *Overstreet v. Shoney's, Inc.,* 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999)). Whether an appraisal or subsequent sale price most accurately reflects the fair market value of a property at the time of breach is driven by the factual circumstances of the case. *See id.* at 231-32.

We have observed that, in some circumstances, "the amount a seller is eventually able to obtain for the property may constitute evidence of its fair market value at the time of the breach." *Id.* at 231. However, "[i]n order for the price received at a subsequent sale to represent the fair market value of the real property, the subsequent sale must be conducted under circumstances similar to those present at the initial sale and in an arms-length fashion." *Id.* at 232 (citation omitted). The circumstances surrounding a subsequent sale, including the seller's motivation "to achieve the highest possible price for the property[,]" are factors to be considered by the trial court when determining whether a subsequent sales price fairly reflects the fair market value of the property at the time of breach. *Id.* at 232-33. We also have observed that, "[u]nder some circumstances, an appraisal may provide a more accurate measure of the fair market value than the actual selling price[.]" *Simpson v. Golden Serv. Realty & Auction, Inc.*, No. 02A01-9509-CH-00203, 1996 WL 732487, at *4 (Tenn. Ct. App. Dec. 23, 1996). This is particularly true in circumstances under which a seller is "under a compulsion to sell." *Id.*

*Hartigan I*, 2020 WL 563522, at *3-4.

As a point of clarity, we note some confusion in the record regarding the date of the Brushes' breach of the purchase contract. As this Court found in *Hartigan I, see id.* at *1, the Brushes withdrew from the purchase agreement on August 27, 2015, when they informed the realtors that they were not going to complete the purchase. In its January

- 21 -

2019 order, the trial court awarded special damages for the Hartigans' "incurred expenses for the preservation and maintenance of the Property from September 7, 2015, the date on which the Purchase Agreement with [the Brushes] terminated . . . ." In its final order on remand, the trial court expressly found: "The date of the breach of contract by [the Brushes] was September 7, 2015, the last date on which the Defendants Brush could have performed per the terms and conditions as set out in the Purchase Agreement . . . ." In his appellate brief, Mr. Brush states that the closing date for the Brushes' purchase of the Property "at the latest, would have been September 7, 2015, according to the Purchase Agreement." Although the Brushes gave notice that they were not going to complete the purchase on August 27, 2015, the parties had agreed in the purchase agreement that the closing would take place no later than September 7, 2015. We therefore determine that the evidence does not preponderate against the trial court's finding that the date of the breach was September 7, 2015.

In *Hartigan I*, this Court remanded to the trial court because although the trial court had found in its January 2019 order that the general damages award should be equal to the difference between the contract price and the amount obtained at the subsequent sale, the trial court's order had "include[d] no findings with respect to the fair market value of the property at the time of the breach . . . ." *Id.* at *4. Specifically, this Court noted that the trial court's order lacked findings as to "the circumstances surrounding the 2016 sale of the property," "why or when the sales price was reduced," and "the appraised value of the property." *Id.*

On remand, the trial court confirmed its determination that the proper measure of general damages in this case should be $162,000.00, or the difference between the $712,000.00 contract price and the subsequent $550,000.00 sales price. In doing so, the trial court found in its final order that other than the removal of furniture and decorations from the home, which the court found to be due to the Brushes' breach, the circumstances surrounding the 2016 sale were substantially similar to those surrounding the initial contract. The trial court also expressly found that the three appraisals performed during the summer of 2015 "were not credible and could not be relied upon by this Court to determine the fair market value" of the Property at the time of the breach. As to how and when the price was reduced to $550,000.00, the trial court found in its final order that this was the amount of the "single offer" received for the Property following the breach. However, the court did not make a specific finding concerning how and when the Hartigans lowered the price. During the trial, Mr. Hartigan testified that they had received the $550,000.00 offer from the ultimate buyers after they had reduced the asking price to $590,000.00 "near the very end."

In the instant appeal, Mr. Brush ostensibly raises two separate issues regarding the trial court's calculation of damages, first challenging separately whether the trial court

erred by declining to afford credibility to the three appraisals, particularly the $712,000.00 appraisal completed most closely to the time of the breach, and then presenting his overarching issue that the trial court erred in its calculation of damages. Accordingly, we will first address the trial court's consideration of the appraisals within its overall findings as to fair market value and the calculation of damages.

However, at the outset, we note that within his argument regarding fair market value, Mr. Brush also asserts that the trial court "improperly charged" him for "improvements" made to the Property by the Hartigans after the Brushes had breached the contract. In its final order, the trial court reiterated its previous award of special damages to the Hartigans, including $28,185.15 for "costs incurred by [the Hartigans] for the upkeep of the property," $9,669.10 for the Hartigans' share of the plaintiffs' reasonable attorney's fees, and $600.00 for the Hartigans' share of a private investigator's fee.[5] Mr. Brush did not raise an issue in the first appeal concerning the amount of special damages awarded to the Hartigans. *See Hartigan I*, 2020 WL 563522, at *3 n.2. As a result, the award of special damages was not at issue on remand and is not properly at issue in this appeal. Moreover, Mr. Brush has not raised an issue regarding special damages in his statement of the issues in this appeal. Insofar as Mr. Brush may be attempting to raise an issue concerning the award of special damages within the argument section of his appellate brief, we deem the issue to be waived. *See* Tenn. R. App. P. 13(b) ("Review generally will extend only to those issues presented for review."); *Forbess v. Forbess*, 370 S.W.3d 347, 356 (Tenn. Ct. App. 2011) ("We may consider an issue waived where it is argued in the brief but not designated as an issue.").

## A. Appraisals

As part of the financing approval process for the Brushes' purchase contract, three appraisals were completed on the Property. Following the initiation of the purchase agreement in June 2015, the Brushes first sought financing with Quicken Loans, which engaged an appraiser that valued the Property at $640,000.00. According to testimony presented by all of the parties involved, realtors included, the realtors' initial reaction to this appraisal was that it was too low. At Carol Ann Buchanan's urging as their realtor, the Brushes sought financing through a local lender, Peoples Home Equity, which secured the second appraisal in July 2015, resulting in a valuation of the Property at $730,000.00. Laura Fritts, the producing branch manager for Peoples Home Equity, testified that it was common practice with what she termed a "jumbo loan," meaning at that time a loan for an amount over $417,000.00, for the underwriter of the loan to require a review of the appraisal. This review resulted in the third appraisal on August 12, 2015, valuing the Property at $712,000.00, the amount of the contract price.

---

[5] Mr. Hartigan testified that the plaintiffs engaged a private investigator to locate the Brushes after the Brushes had given notice that they would not be completing the purchase.

The two appraisals to which Mr. Brush specifically argues the trial court should have afforded greater weight are the $730,000.00 and $712,000.00 appraisals, which were presented as exhibits by the plaintiffs during Ms. Fritts's testimony. In response to Mr. Brush's argument, the Hartigans posit that the trial court properly considered the appraisals but found that the better measure of fair market value under the circumstances was the subsequent sale price. The Hartigans state that they proffered the appraisals at trial as evidence that the appraisal contingency of the purchase agreement had been fulfilled rather than as evidence of the Property's fair market value.[6]

In its final order, the trial court concluded that "the three appraisals in the record, performed as a part of the Defendants Brush loan, were not credible and could not be relied upon by this Court to determine the fair market value of the property as of the date of the Defendants Brush breach." In support of this conclusion, the trial court also articulated in part:

> The court considered the appraisals that were performed as a part of the Defendants Brush loan in determining the fair market value of the Property as of the date of the Defendant Brushes' breach, but found them to be unreliable based upon testimony presented at trial, including . . . but not limited to, the testimony of [Mr. Brush].

Mr. Brush particularly takes issue with the trial court's characterization of his testimony concerning the appraisals, also noting a finding made by the court that Mr. Brush had offered testimony "that he did not trust the appraised values as found by the various appraisals for many reasons, one being that none of the appraisers used comparables found anywhere in the immediate area of the property." Mr. Brush urges that the overall import of his testimony was that through the process of attempting to purchase the Property, he developed mistrust of Ms. Buchanan, the realtor representing the Brushes as buyers, rather than mistrust of the appraisals.

Upon review of the record, including the entire trial transcript, we agree that Mr. Brush's developing mistrust of his realtor is evident in his testimony. However, Mr. Brush also did not express confidence in the appraisals. Mr. Brush testified that after the first appraisal resulted in a valuation of $640,000.00, he began to question why the

---

[6] The Hartigans also posit that Mr. Brush waived any argument in favor of the accuracy of the appraisals by failing to argue such during trial, citing *Watson v. Watson*, 309 S.W.3d 483, 497 (Tenn. Ct. App. 2009) ("Issues that are not raised in the trial court may . . . be deemed waived."). However, we determine that with the presentation of the appraisals as exhibits by the plaintiffs, the accuracy of the appraisals was properly before the trial court as one consideration of fair market value. Therefore, we decline to deem Mr. Brush's argument waived in this regard.

Property would be valued that low and discovered, through online research, information regarding the 2008 Tennessee Valley Authority coal ash spill in Kingston. Testimony and email correspondence presented during trial also demonstrated, however, that when the Brushes questioned Ms. Buchanan concerning the coal ash spill, she provided information to them, and the Brushes decided to go forward with the purchase at that time.[7] Mr. Brush further testified that when informed of the need for a second appraisal, he and his wife were concerned that it might again be insufficient for the lender. Mr. Brush stated:

> And [Ms. Buchanan] said, "Well, I can't really do much with the appraiser. I can't pick the appraiser, but I know this guy and he helped me on a house a couple of years ago that we were having trouble getting appraised, and we got it done. And guess who has to let him into that property and that gate when he comes out there to appraise that property?" Oh, okay. And, magically enough, the appraisal came in $100,000 higher than the other guy.
>
> And then when I looked at it – in retrospect, when I looked at it, all three of the comps that he had on there were from Knoxville, Tennessee, the same place where the other guy used comps at $100,000 less. I don't know what's wrong with this picture, but it started not smelling good to me.
>
> * * *
>
> My credibility in her [Ms. Buchanan] went out the window when I found out about that coal ash spill and we weren't informed.

Mr. Brush insists that because the Hartigans' counsel read the above transcript passage, among others, from Mr. Brush's testimony to the trial court during the remand hearing, the court accepted Mr. Brush's statements out of context, which he argues is evinced by the trial court's finding that Mr. Brush found the appraisals to be unreliable. Mr. Brush thereby emphasizes his earlier argument that the trial court accepted the proposed final order prepared by the Hartigans' counsel in error. We find this argument to be unavailing. The gravamen of Mr. Brush's testimony was certainly that he had developed mistrust for his representation in the real estate proceedings at issue. However, the central issue before the trial court on remand, as it is before this Court on appeal, was the fair market value of the Property, and we do not discern error in the trial court's finding that neither Mr. Brush nor the real estate professionals expressed confidence in the accuracy of the appraisals.

---

[7] Undisputed testimony indicated that the Property was not positioned on the water, was located several miles from the Tennessee Valley Authority plant, and was not included in any reclamation efforts.

As the Hartigans note, the trial court stated in its final order that it "considered" the appraisals but found them to be "unreliable." In its ruling at the close of trial, the court stated in relevant part:

> The size and location of the house made it difficult even to find comparables in value for the purpose of making an appraisal. It would have . . . seemed extremely difficult to find comparable sales of comparable homes anywhere nearby, and I think that was in the testimony as well.

Mr. Brush argues that the trial court contradicted itself because it found in its oral ruling that the house was "incredible," "spectacular," and "like a million dollar house." We disagree. The court found that given its location and the lack of comparable homes in the area, the home was simply too expensively built for the Hartigans to recover the over $900,000.00 they had spent in constructing it. Mr. Brush's argument conflates the trial court's findings regarding the cost to build the home and its impressive features with fair market value. Instead, the court found quite the opposite, stating in its oral ruling that "the house was going to sell for less than what it cost to build it from the day it was built." We determine that the trial court properly considered the appraisals in light of the other evidence presented and that the totality of the evidence did not preponderate against the trial court's finding that the appraisals were unreliable under the specific facts of this case as indicators of fair market value at the time of the breach.

## B. Fair Market Value and Calculation of Damages

Having found the appraisals to be unreliable as to fair market value of the Property at the time of the breach, the trial court determined the most accurate measure of fair market value to be the sale price obtained by the Hartigans in September 2016, approximately a year after the Brushes had breached the purchase agreement. To establish that the subsequent sale price was the best measure of fair market value, the Hartigans were required to prove that "the subsequent sale [was] conducted under circumstances similar to those present at the initial sale and in an arms-length fashion." *See Hatchel*, 223 S.W.3d at 232 (internal citations omitted). In its final order, the trial court found concerning the subsequent sale:

> The sale of the Property to the third-party buyers . . . was an arms-length transaction which closed on September 29, 2016.
>
> Similar to the Purchase and Sale Agreement between [the Brushes] and [the Hartigans], the contract between [the Hartigans] and the third-party buyers . . . utilized the same form generated by the Tennessee Association

of Realtors; had the same four contingencies: an appraisal contingency, a home inspection contingency, a title contingency, and a financial contingency; and was substantially similar to the contract entered into with [the Brushes].

The purchase price achieved for the sale of the property to the third-party buyers . . . in the amount of $550,000.00 was an arms-length transaction between willing buyers and willing sellers neither under any compulsion to buy or sell.

To the extent that the property was unfurnished at the time the property was placed back on the market, this was caused by [the Brushes'] breach. The furnishings were removed by [the Hartigans] in an effort to comply with the terms and conditions of the Purchase Agreement with [the Brushes] to yield possession of the property to [the Brushes] at closing. [The Brushes] were aware the furnishings had been removed as of the date of their breach and to the extent the furnishings being removed impacted the second sale, this was caused by [the Brushes'] breach.

The purchase agreement with the third-party buyers . . . was achieved using a substantially similar marketing method as the marketing method that was used to achieve the contract with [the Brushes].

The purchase price paid by the third-party buyers . . . is the best evidence of the fair market value of the property as of the date of [the Brushes'] breach of contract with [the Hartigans].

(Paragraph numbering omitted.) Upon careful review, we agree with the trial court.

Mr. Brush contends that the subsequent sale was not substantially similar to the purchase agreement at issue specifically because (1) the purchase price was different, (2) a "fillable" blank in the third-party contract's financial contingency stated that the agreement was conditioned on the buyers' "ability to obtain a loan(s) in the principal amount up to tbd% of the Purchase Price," as opposed to the 80% of the principal amount that was required in the same contingency of the purchase agreement at issue; and (3) the Hartigans had made "improvements" to the Property, including repairing a crack in the driveway, patching drywall where artwork had been hung, repairing lawn sprinkler heads, and repairing a motion light. We are not persuaded that these distinctions render the two sales to be dissimilar.

First, the purchase price is, of course, the issue at hand as to the fair market value the Hartigans were able to recover and does not equate to a substantial difference in the manner of the two sales. Second, although Mr. Brush testified that he was surprised that twenty percent of the purchase price was required as a down payment, he did not attempt to demonstrate that his breach was due to insufficient funds for the down payment and actually testified to the opposite. Third, the trial court found that what Mr. Brush is describing as "improvements" were actually repairs needed to maintain the Property, crediting Mr. Hartigan's testimony and documentation of the repairs to this effect.

When questioned regarding how the Property was marketed after the Brushes withdrew from the purchase, Ms. Martin, the Hartigans' realtor responded: "[W]e had to put it back in the website, we had to – you know, we did numerous Home Guide ads. I did another agent tour on the property. We did open house. We just continued to market the property and put it into MLSs [multiple listing services]." Mr. Hartigan testified that although they had moved the bulk of their furniture to Michigan in August 2015 in preparation for the anticipated closing with the Brushes, he and his wife traveled back and forth to ensure that at least one of them was on the Property twenty-five percent of the time for insurance purposes. His testimony and his detailed expense sheets established that the Hartigans maintained the Property in good order during the pendency of the subsequent sale.

Mr. Hartigan and the real estate professionals involved each respectively opined that a vacant home, or in this case, one that was not fully furnished and decorated, would typically sell for less than an occupied, furnished home. The trial court found that this distinction between the two sales, specifically the lack of furniture and decorations for the second sale, may have had an impact on the reduced price. However, finding that the Hartigans had moved their furnishings mere days before the anticipated closing in August 2015, the court further found that the absence of the furniture for the second sale was due to the Brushes' breach and was therefore not a distinction that should affect the measure of damages as determined by the fair market value.

In support of his overall position that the trial court should have chosen the $712,000.00 appraisal over the subsequent sale price as the appropriate measure of fair market value, Mr. Brush relies on this Court's decision in *Tinkham v. Beasley*, No. M1999-02809-COA-R3-CV, 2000 WL 1727780 (Tenn. Ct. App. Nov. 22, 2000). In *Tinkham*, which also involved breach of a contract for real estate, the trial court found that the fair market value was the contract price but nonetheless awarded damages in the amount of the difference between the contract price and an amount subsequently obtained by the sellers at auction. *See Tinkham*, 2000 WL 1727780, at *1. Affirming the trial court's finding that the contract price was the most accurate measure of fair market value, this Court, however, reversed the damages award, determining that because "[t]he

undisputed measure of damages is the difference between the fair market value and the contract price," the damages were zero. *Id.* at *3.

In the case at bar, the trial court properly found that the measure of damages was the difference between the fair market value and the contract price. As to the fair market value, we find *Tinkham* to be highly factually distinguishable from this case because the subsequent sale in *Tinkham* was a forced sale at auction. *See Tinkham*, 2000 WL 1727780, at *3 ("The fact that the house sold for $155,000 in a forced sale at auction some four months later does not undermine the trial court's decision not to value the home at less than $167,000 because, as Mrs. Tinkham testified, one would expect that property sold at auction would bring a lower price." (citing *Turner v. Benson*, 672 S.W.2d 752, 755 (Tenn. 1984)).

Furthermore, we find Mr. Brush's reliance on *Corbitt*, 2012 WL 4473963, to be unavailing, not precisely because *Corbitt* involved comparison of two auction sales, but because this Court found significant differences in the manner in which the two auction sales were advertised and conducted. *See Corbitt*, 2012 WL 4473963, at *1. The *Corbitt* Court determined that the substantial difference in the two sales was the primary reason for the reduced price at the second sale and thereby determined the fair market value to be the same as the contract price. *Id.* In contrast, the evidence presented in this matter does not preponderate against the trial court's finding that the manner by which the instant purchase agreement was entered and by which the subsequent sale was achieved were substantially similar.

Having determined that the trial court did not err in finding the fair market value to be the amount obtained in the subsequent sale of the Property, we further determine that the trial court properly found the measure of general damages to be the difference between the contract price of $712,000.00 and the subsequent sale price of $550,000.00. *See Hatchel*, 223 S.W.3d at 232. We therefore affirm the award of general damages to the Hartigans in the amount of $162,000.00.

## VI. Prejudgment Interest

Based on his contention that the general damages award to the Hartigans should have been zero, Mr. Brush initially argues that the trial court erred by awarding any prejudgment interest to the Hartigans. Inasmuch as we have determined in the previous section of this Opinion that the trial court did not err in awarding to the Hartigans general damages in the amount of $162,000.00, we find Mr. Brush's argument in this regard to be pretermitted as moot.

However, Mr. Brush argues in the alternative that the trial court abused its discretion in calculating the prejudgment interest, positing that prejudgment interest awarded to the Hartigans "should be calculated to factor in the sale of the Property to the third-party buyers" and should therefore not include the period of time between the September 2016[8] closing on the third-party contract and the October-December 2018 trial. Mr. Brush also postulates that in awarding prejudgment interest, the trial court failed to account for the Hartigans' relief from the obligation to "pay the $10,800.00 differential in the commission owed" to Coldwell Banker after the third-party sale closed. We discern no abuse of discretion in the trial court's award to the Hartigans of prejudgment interest.

In *Hartigan I*, this Court vacated the trial court's initial $25,632.00 award of prejudgment interest to Coldwell Banker, related to the exclusive buyer representation agreement, agreeing with Mr. Brush's position that "Coldwell Banker was not deprived of the use of this amount for the entire period between the time of breach and the date of judgment where Coldwell Banker recovered $19,800 when the property sold in October 2016." 2020 WL 563522, at *5. Accordingly, this Court remanded for recalculation of the prejudgment interest awarded to Coldwell Banker, quoting with approval this Court's previous decision in *Scholz v. S.B. Int'l, Inc.* 40 S.W.3d 78, 82 (Tenn. Ct. App. 2000), as follows:

> An award of prejudgment interest addresses damages incurred by a party "because they have been deprived of the use of that money from the time they should have received it until the date of judgment." *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 82 (Tenn. Ct. App. 2000). Prejudgment interest may not be appropriate under some circumstances, however, including "when the party seeking prejudgment interest has already been otherwise compensated for the lost time value of its money." *Id.* at 83.

*Hartigan I*, 2020 WL 563522, at *5. As noted previously, the parties agreed on remand to a recalculation of the prejudgment interest awarded to Coldwell Banker.

In contrast, the damages award to the Hartigans is predicated on the difference between the contract price and the fair market value of the Property at the time of the breach. The Hartigans have been without the use of the $162,000.00 difference for the entire pendency of this matter. They did not recover any portion of that $162,000.00 difference through the September 2016 closing of the third-party sale. Mr. Brush also

---

[8] Two dates, merely four days apart, appear in the record for the closing of the third-party purchase of the Property: September 29, 2016, and October 3, 2016. Because the trial court in its final order found that the sale closed on September 29, 2016, we have referenced that date here.

argues that because the commission the Hartigans owed to their realtor, Coldwell Banker, was less under the lower price of the second sale than it would have been under the instant purchase agreement, the trial court should have credited Mr. Brush with the benefit of that reduced amount through a reduced award of prejudgment interest to the Hartigans. We do not find, however, that the principles espoused in *Scholz* dictate that the Hartigans' recovery for the Brushes' breach of the purchase agreement should be affected by the Hartigans' third-party contractual responsibilities with Coldwell Banker. *See Scholz*, 40 S.W.3d at 83 ("Fairness will, in almost all cases, require that a successful plaintiff be fully compensated <u>by the defendant</u> for all losses caused by the defendant, including the loss of use of money the plaintiff should have received.") (emphasis added).

In its final order, the trial court awarded to the Hartigans a total judgment in the amount of $225,688.98, which consisted of the general damages award of $162,000.00, minus a credit to Mr. Brush for the $6,000.00 in forfeited earnest money, plus $28,185.15 for costs incurred to maintain the Property, $9,669.10 for the Hartigans' share in the plaintiffs' reasonable attorney's fees, $600.00 for the Hartigans' share in the cost of a private investigator, and $31,234.73 in prejudgment interest. The trial court did not abuse its discretion in its calculation of prejudgment interest awarded to the Hartigans.

## VII. Post-Judgment Interest

Again based on his contention that the general damages award to the Hartigans should have been zero, Mr. Brush argues that the trial court's award of post-judgment interest to the Hartigans should be vacated. Tennessee Code Annotated § 47-14-122 (2013) provides: "Interest shall be computed on every judgment from the day on which the jury or the court, sitting without a jury, returned the verdict without regard to a motion for a new trial." Having determined that the trial court did not err in its award of damages to the Hartigans, we further determine that the trial court properly awarded statutory post-judgment interest to the Hartigans as well. *See Clement v. Clement*, No. W2006-00691-COA-R3-CV, 2007 WL 2318659, at *4 (Tenn. Ct. App. Aug. 15, 2007) ("It is well-settled that the post-judgment interest statute is mandatory, and that trial courts cannot ignore it." (citing *Vooys v. Turner*, 49 S.W.3d 318, 322 (Tenn. Ct. App. 2001)).

## VIII. Conclusion

For the foregoing reasons, we affirm the judgment of the trial court in its entirety. We remand this case for enforcement of the judgment and collection of costs below. Costs on appeal are taxed to the appellant, Arnold Brush, individually and in his capacity as Administrator of the Estate of Pamela Sue Brush.

s/ Thomas R. Frierson, II
THOMAS R. FRIERSON, II, JUDGE